## KRENTLER–ARNOLD HINGE LAST CO. v. LEMAN et al.

(Circuit Court of Appeals, First Circuit. July 2, 1926.)

No. 1910.

**1. Courts ⊚⇒347.**

Under equity rule 30, a defendant may set up by counterclaim any equitable cause of action he may have against complainant, of which the court has jurisdiction.

**2. Patents ⊚⇒283(1)—In infringement suit, defendant may counterclaim for infringement of different patent (equity rule 30).**

A complainant, by bringing suit for infringement in a district of which he is not an inhabitant, and in which he has no regular and established place of business, consents to being sued therein on a counterclaim based on an independent and unrelated cause of action, as for infringement of another patent.

**3. Courts ⊚⇒276—General appearance is waiver of objection to jurisdiction of federal court in district of suit.**

Complainant in an infringement suit, which appeared generally and filed answer to a counterclaim, and submitted to trial and decision on its merits, waived any right it might have had to object to being sued in that district.

**4. Patents ⊚⇒286—Exclusive licensee is owner of title for purposes of suit for infringement.**

An exclusive license from a half owner of a patent to the owner of the other half, his heirs and assigns, to make, use, and vend the invention throughout the United States for the full term of the patent, made the licensee owner of the entire title, with the right to sue for infringement in his own name alone.

**5. Abatement and revival ⊚⇒41—Assignment of patent does not abate suit by assignor for its infringement.**

A transfer of a patent by the owner does not carry the right to profits and damages for past infringements, and does not abate a pending suit for infringement by the assignor.

**6. Patents ⊚⇒290—Assignee of owner, pending suit by him for infringement, held entitled to intervene.**

The half owner of a patent, who was also exclusive licensee of the owner of the other half, pending a suit in which by counterclaim he alleged its infringement, conveyed his business and business property, including patents, to a corporation organized by him. Before decree in his favor he died, and his administrator revived the suit and also made an assignment to the corporation. Held, that such assignment conveyed certain rights in the recovery, which entitled the corporation to intervene as counterclaimant, but that the patentee, licensor of decedent, had no interest which entitled him to intervene.

**7. Patents ⊚⇒328.**

The Krentler patent, No. 842,319, for shoe last, held not infringed.

**8. Patents ⊚⇒328.**

The Carl patent, No. 969,244, for shoe last, claim 1, held void for lack of invention.

**9. Patents ⊚⇒328.**

The Peterson patent, No. 1,195,266, for shoe last, held valid and infringed.

Appeal from the District Court of the United States for the District of Massachusetts; James Arnold Lowell, Judge.

Suit in equity by the Krentler-Arnold Hinge Last Company, against J. Howard Leman, administrator, and others. Decree for defendants on a counterclaim, and complainant appeals. Modified and affirmed.

For opinion below, see 300 F. 834.

This is a bill in equity brought in the federal District Court for Massachusetts, September 12, 1923, by the Krentler-Arnold Hinge Last Company, a Michigan corporation, against George E. Belcher, a resident and citizen of Massachusetts, for infringement of the Krentler patent, No. 842,319, issued January 29, 1907, for a last, and of the Carl patent, No. 969,244, issued September 6, 1910, also for a last.

November 24, 1923, Belcher filed an an-

swer, denying, among other things, the validity and infringement of said patents, and set up a counterclaim for infringement of the Peterson patent No. 1,195,266, issued August 22, 1916, alleging ownership of a half interest in the patent, and an exclusive license under the other half interest, which Peterson had empowered him to protect. March 13, 1924, the plaintiff filed a motion to strike from defendant's answer the second clause, the second, third, and fourth paragraphs of clause 3, all of clause 6, and clauses 8 to 17, inclusive, the latter embodying the counterclaim under the Peterson patent, as improper and unwarranted. At the same time the plaintiff filed affidavits, in support of its motion, to the effect that it did not manufacture or use lasts; that it held patents, and issued licenses to manufacturers who might wish to make, sell, and deal in lasts covered by its patents.

On April 14, 1924, after hearing, the motion was denied. Thereafter, on April 22, 1924, the plaintiff filed an answer to the counterclaim in which, among other things, it denied the validity and infringement of the Peterson patent. On June 2, 1924, the day before the case came on for trial upon the merits, and to facilitate the trial, counsel for the respective parties filed a stipulation as to the following matters: (1) For a stenographer and how he should be paid; (2) for the use of printed copies of letters patent; (3) that Belcher was a licensee under a written license from the plaintiff from May 3, 1902, to March 5, 1919, when the license was canceled, but that the defendant thereafter continued to buy hinge parts and make lasts employing plaintiff's B. B. hinges with plaintiff's consent; and (4) that each party concedes the title of the other party's letters patent as good and sufficient for the purpose of the present suit. They also agreed upon what were correct copies of plaintiff's and defendant's patents, and that certain exhibits claimed to be infringements of plaintiff's patents, represented lasts manufactured by the defendant, and that certain exhibits, claimed to be infringements of defendant's patent, represented lasts manufactured by authority of the plaintiff both within and outside the district of Massachusetts.

The trial occurred on the 3d, 4th, and 5th days of June, 1924. The case was argued on July 18, and on July 24, 1924, the court handed down an opinion holding (1) that Belcher did not infringe the Krentler patent; (2) that the Carl patent was invalid;

and (3) that the Peterson patent was valid and infringed by the plaintiff.

August 28, 1924, and before a decree was entered, Belcher died. Thereupon one Leman was appointed administrator with the will annexed of Belcher's estate, and on October 30, 1924, having had the counterclaim revived, was substituted in Belcher's place as a party defendant and counterclaimant.

It is agreed that on April 1, 1924, Belcher executed and delivered to the George E. Belcher Company, a corporation which he had organized to take over and carry on his last business, a contract wherein, after setting out the parties, it was agreed:

"(1) The grantor hereby gives, grants, bargains, sells, assigns, transfers, and sets over unto the company, its successors and assigns forever, the real estate, buildings, machinery, tools, automobiles and equipment, merchandise, raw, wrought or in process, supplies, office equipment, tangible personal property of all kinds, and cash now used by said grantor in the last, stretcher, and fastener businesses conducted by him under his name at Stoughton, Mass., to the extent and as specifically set forth in the statement thereof dated April 1, 1924, a copy of which is attached hereto.

"(2) The company agrees to pay one hundred fifty (150) dollars in cash, and to issue forthwith to the grantor or his nominee or nominees four thousand nine hundred ninety-seven (4,997) shares of its common capital stock without par value, in consideration of the transfer to it of the aforesaid property. Of the assets to be transferred to the company, two hundred forty-nine thousand eight hundred fifty (249,850) dollars shall constitute payment in full for the four thousand nine hundred and ninety-seven (4,997) shares of the common capital stock of the company without par value to be issued as above set forth, being at the rate of fifty (50) dollars per share, and the excess thereof over said two hundred forty-nine thousand eight hundred fifty (249,850) dollars and said one hundred fifty (150) dollars to be paid in cash shall constitute a paid-in surplus of the company available for its general corporate purposes, and so far as permitted by law available for dividends in the discretion of its board of directors.

"(3) The real estate set forth in said statement is to be transferred by separate deed to the company, and so far as the property described in this agreement is concerned said deed is confirmatory hereof. Attached

hereto is a schedule of such real estate, giving a description of the land, together with the area thereof, which is to be conveyed to the company.

"(4) The grantor hereby constitutes the company his agent and attorney to receive, collect, enforce, and sue for any of the property and rights hereby granted and assigned, either in his name or in the name of the company, as his legal attorney thereunto duly authorized, but for the use of the company.

"(5) The grantor hereby further agrees that he will, and his heirs, executors, and administrators shall, at any time and from time to time, at the request of the company, execute and deliver to it any new or confirmatory instrument; and all other and further instruments necessary or convenient, or which the company may request, to vest in the company full title, right, or interest in or to any of the property hereby conveyed, or to enable the company to realize upon or otherwise enjoy any such property, or to carry into effect the intent or purpose hereof."

The statement referred to in the first paragraph of the above contract reads as follows:

George E. Belcher, Stoughton, Massachusetts.
Consolidated Statement, Last, Stretcher, and Fastener Business, April 1, 1924.

### Assets.

| | |
|---|---:|
| Cash | $ 10,000.00 |
| Power plant and machinery | 72,704.34 |
| Automobiles | 10,503.00 |
| Patents | 1,000.00 |
| Models and patterns | 5,000.00 |
| Good will | 15,000.00 |
| Inventory | 112,491.52 |
| Wooden buildings | 35,692.29 |
| Brick buildings | 27,910.67 |
| Miscellaneous equipment | 26,526.19 |
| Tenements A, B, D | 11,435.15 |
| Land | 5,050.00 |
| Total Assets | $333,313.16 |

### Liabilities.

| | |
|---|---:|
| Reserve for depreciation: | |
| Machinery | $ 39,107.50 |
| Automobiles | 6,235.46 |
| Wooden buildings | 11,867.69 |
| Brick buildings | 4,640.15 |
| Miscellaneous equipment | 14,688.68 |
| Tenements | 3,802.14 |
| Geo. E. Belcher capital | 252,971.54 |
| Total liabilities and capital | $333,313.16 |

And then follows a schedule of the real estate.

The existence of this contract was not made known to the court at the time of the trial, and was not known to the plaintiff or its counsel until some time in January, 1925, and apparently was not known to Belcher's counsel at the time of the trial. At the time of the trial Belcher was sick and unable to be present. He was afflicted with the malady from which he soon died.

It is further agreed that on December 15, 1924, Leman, administrator of Belcher's estate, executed and delivered to the Belcher Company the following assignment:

"Assignment of Belcher One-Half Interest under the Peterson Patent, No. 1,195,266, to George E. Belcher Company.

"Whereas, under an assignment dated the 2d day of March, 1915, and recorded in the United States Patent Office in Liber L–97, page 156, of the transfer of patents, Otto A. Peterson, of Stoughton, Massachusetts, conveyed, transferred, and assigned a one-half interest to George E. Belcher, of Stoughton, Massachusetts, in, to, and under an invention relating to shoe lasts by Otto A. Peterson, covered in an application for patent filed March 3, 1915, serial No. 1,195,266, which issued on said application; and

"Whereas, said George E. Belcher died on or about the 28th day of August, 1924, and whereas, J. Howard Leman was duly appointed administrator c. t. a. of the estate of George E. Belcher, deceased, on or about the 17th day of October, 1924, by the probate court for the county of Barnstable, commonwealth of Massachusetts; and

"Whereas, J. Howard Leman, as administrator c. t. a. of the estate of George E. Belcher, holds the title to the one-half interest in the Otto A. Peterson patent, No. 1,195,266, previously held by said George E. Belcher, deceased; and

"Whereas, the George E. Belcher Company, a corporation organized and existing under the laws of the commonwealth of Massachusetts and having a principal place of business at Stoughton, Massachusetts, having succeeded to the last business previously personally conducted by George E. Belcher at Stoughton, Massachusetts, is desirous of obtaining an assignment to it of the one-half interest above referred to under the Otto A. Peterson patent, No. 1,195,266:

"Now, therefore, in consideration of one dollar in hand paid, the receipt whereof is hereby acknowledged, and for other good and valuable considerations, witnesseth:

"J. Howard Leman, as duly appointed administrator c. t. a. of the estate of George E. Belcher, deceased, hereby conveys and as-

signs unto the George E. Belcher Company, its successors and assigns, the said one-half right, title, and interest of George E. Belcher, deceased, in, to, and under the Otto A. Peterson patent, No. 1,195,266.

"The said one-half right, title, and interest hereby conveyed to the George E. Belcher Company to be held and enjoyed by it for its own use and behoof, and by its successors and assigns, as fully and entirely as the same would have been held and enjoyed by J. Howard Leman, as administrator c. t. a. of the estate of George E. Belcher, deceased, had this assignment and sale not been made; and J. Howard Leman, as administrator c. t. a. of the estate of George E. Belcher, deceased, further assigns and sets over to the George E. Belcher Company, its successors and assigns, all such rights of action, claims for damages, profits, and costs, and all other demands for any sum or sums of money whatsoever, which said J. Howard Leman, as administrator of the estate of George E. Belcher, deceased, has or may have, either at law or in equity, against any and all persons, firms, corporations, or associations by reason of past infringements of the rights conveyed under said Peterson patent, No. 1,195,266.

"In witness whereof, I have hereunto set my hand and seal this 11th day of December, 1924. J. Howard Leman, Administrator c. t. a. of the Estate of George E. Belcher, Deceased.

"Elma S. Leavis, Witness."

This assignment was acknowledged before a notary public by Leman, and consented to by Elva A. Belcher, "wife of George E. Belcher, deceased."

On February 12, 1925, the Belcher Company filed a petition, asking leave to intervene and be joined as a party defendant and counterclaimant, alleging that it was the owner of a one-half interest in the Peterson patent, by virtue of the assignment above set out, and praying that "it be allowed to become and be joined as a party defendant and counterclaimant in the above-entitled case, and entitled to such rights, benefits, advantages, and reliefs herein under and pursuant to the opinion of this court, that were or would have been, under the rights so acquired, available to George E. Belcher, his administrators or assigns, as their interest may appear." At the same time Peterson filed a petition to intervene, setting out that he had an interest in the Peterson patent; that he was the owner of one-half interest therein; that prior to Belcher's death he has

granted to Belcher, "his heirs, executors, administrators, assigns, and his legal representatives, an exclusive license under said Peterson patent under the half interest owned by him," the said Peterson; and prayed that he be allowed to become a party plaintiff in the action for infringement of the Peterson patent set up in the counterclaim, and, so far as his interest may be affected, "he be entitled to all the rights, benefits, reliefs, and advantages herein under and pursuant to the opinion of this court now on file in the above-entitled case."

In the license from Peterson to Belcher under the Peterson patent, it was provided, among other things:

"First. Said Peterson hereby grants unto said Belcher the exclusive right and license to make, use, and sell, or cause to be made and sold, last attachments embodying his invention, as set forth in his aforesaid letters patent, granted therefor, to the full end of the term for which said letters patent are granted, but subject, nevertheless, to the conditions as hereinafter stated.

"Second. Said Belcher agrees to pay said Peterson a royalty of one cent per pair for each pair of said last attachments made by him and sold, or caused to be made and sold by him."

"Sixth. It is understood and agreed that this license and agreement, and all rights therein and thereunder, shall be binding upon the heirs, executors, administrators, and assigns and legal representatives of the parties hereto."

On February 12, 1925, the plaintiff, on its part, filed a motion to amend its answer to the counterclaim, and a paper entitled "Suggestion of Abatement and Motion for Dismissal of Counterclaim," in both of which it set out that Belcher had formed a corporation known as the George E. Belcher Company, and had on April 1, 1924, transferred to it (as per agreement of that date above set forth) the property and assets of the business theretofore conducted by him for a consideration of 4,997 shares of the 5,000 shares constituting the stock of the corporation; that the patent set up in defendant's counterclaim was a patent used by Belcher in said business, and was sold and assigned to the corporation by the agreement of April 1, 1924; that since then the Belcher Company had made and sold lasts under and in accordance with the Peterson patent; that said manufacture and sale constituted its principal business; that the formation and existence of the corporation and the making of

the assignment were withheld from the court and the plaintiff and its attorneys, and were not known to them until January, 1925, and that by reason of the assignment of April 1, 1924, the counterclaim abated; and prayed that the counterclaim be dismissed.

On February 16, 1925, the cause came on to be heard on the plaintiff's suggestion of abatement, its motion to amend its answer, and the two petitions to intervene. At the conclusion of the hearings the Belcher Company and Peterson were granted leave to intervene and be joined as defendants and counterclaimants, but the plaintiff's suggestion of abatement and its motion to amend its answer were denied, subject to exception.

James R. Hodder signed the suggestion of abatement and the motion for dismissal of the counterclaim as attorney for the plaintiff. He has acted as counsel for the plaintiff from the institution of the suit to the present time, and on February 12, 1925, the date of the filing the petitions to intervene, the motion to amend the answer, and the suggestion of abatement, the firm of Roberts, Roberts & Cushman filed a general appearance as counsel for the plaintiff in the case, and have since been associated with Mr. Hodder in its conduct.

Thereafter, on February 18, 1925, Roberts, Roberts & Cushman, purporting to appear specially for the plaintiff, presented to the clerk papers entitled "Answer of Plaintiff to the Intervening Petitions of Belcher Company and of Peterson," in which, among other things, the plaintiff alleged that the counterclaim abated on April 1, 1924, when Belcher executed and delivered to the Belcher Company the contract of that date, and that, if the Belcher Company was the owner of the one-half interest alleged to have been assigned by Leman, administrator, to it, thereby the counterclaim also abated, and for the first time it set up that the court was without jurisdiction to hear and determine the cause alleged in the counterclaim, because the plaintiff was a Michigan corporation, had not a regular or established place of business within the limits of Massachusetts, and had committed no acts of infringement of the Peterson patent within that district.

May 27, 1925, Leman, the Belcher Company, and Peterson filed motions asking the court to strike from the record and files the plaintiff's answers to the petitions of Peterson and the Belcher Company, setting up that the answers were filed after the allowance of the petitions in open court on February 16, 1925, and further stated (1) that the filing of the alleged answers was merely an effort to obtain reconsideration of the matters determined by the court on February 16, 1925, and of the plaintiff's suggestion of abatement and prior motion for leave to amend plaintiff's answer to defendants' counterclaim; (2) that the plaintiff had not obtained leave to file the answers; (3) that there was no necessity for further answers by the plaintiff to the petitions of the Belcher Company and Peterson, as no new issue was raised by their petitions; (4) that the plaintiff had had a full opportunity to be heard and had been heard on February 16, 1925, as to the interests of the Belcher Company and of Peterson in the counterclaim; and (5) that the plaintiff had waived its right to object to the jurisdiction of the court to entertain the counterclaim by the original and intervening defendants.

July 22, 1925, the plaintiff filed a motion for a hearing upon the petition of the Belcher Company and Peterson to intervene and the plaintiff's answers thereto, and on July 26, 1925, the cause came on to be heard on the motion for hearing and the motions to strike the answers from the record and files; the stipulation of July 21, 1925, admitting the execution and delivery of the assignment of December 11, 1924, being presented and filed. After hearing the parties, the court granted the motion to strike from the files the answers, and denied the plaintiff's motion to set the cause down for hearing on the issues sought to be raised by the answers to the petitions, and on the 3d day of August, 1925, an interlocutory decree was entered, dismissing the appellant's bill, finding the Peterson patent valid and infringed, and awarding an injunction and accounting to the counterclaimants.

Robert Cushman and James R. Hodder, both of Boston, Mass., for appellant.

Ellis Spear, Jr., of Boston, Mass. (Eiffel B. Gale, of Yonkers, N. Y., and Victoria Lowden, of Jamaica Plains, Mass., on the brief), for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge (after stating the facts as above). [1] The first question presented by the appellant (the Krentler Company) is that Belcher, the original defendant, could not in his answer set up and maintain a counterclaim for the infringement of a patent owned by him; that under federal equity rule 30, as construed by the

District Courts in this circuit, a subject-matter not arising out of the cause of complaint stated in the bill could not be set up by way of counterclaim. In support of this contention reliance is placed upon the cases of Terry Steam Turbine Co. v. B. F. Sturtevant Co. (D. C.) 204 F. 103, Colman v. American Warp Drawing Machine Co. (D. C.) 235 F. 531, and Klauder-Weldon Dyeing Co. v. Giles (D. C.) 212 F. 452. It is true that these cases so hold, but since they were decided rule 30 has been construed by the Supreme Court to be of much broader scope, and to entitle a defendant to avail himself, by way of counterclaim, of matter which might be the subject of an independent suit in equity. American Mills Co. v. American Surety Co., 260 U. S. 360, 43 S. Ct. 149, 67 L. Ed. 306. It was there said:

"That which grows out of the subject-matter of the bill must be set up [by counterclaim] in the interest of an end of litigation. That which does not may be set up, if the defendant wishes, in one proceeding in equity quickly to settle all equitable issues capable of trial between them in such a proceeding, even though they are not related. Buffalo Specialty Co. v. Vancleef [D. C.] 217 F. 91. The formality of cross-bills is not required, and the rule goes as far as possible to facilitate the prompt disposition of equitable controversies between the same litigants. The rule should be liberally construed to carry out its evident purpose of shortening litigation, but the limitation of counterclaims to those which are equitable is imperative."

See, also, Wire Wheel Corp. of America v. Budd Wheel Co. (C. C. A.) 288 F. 308 (4th Cir.), Cooling Tower Co., Inc., v. C. F. Braun (C. C. A.) 1 F.(2d) 178 (9th Cir.), and Le Sueur v. Manufacturers' Finance Co. (C. C. A.) 285 F. 490, 495 (6th Cir.).

[2] The second contention is that the District Court was without jurisdiction to entertain the counterclaim, on the ground that it was not an inhabitant of the district of Massachusetts and had no regular and established place of business in the district, as required in section 48 of the Judicial Code (Comp. St. § 1030).

In the District Courts in this circuit, where it has been held that, under rule 30, a defendant in an equity proceeding can counterclaim only for matter arising out of the transaction complained of in the plaintiff's bill, it has also been held that a plaintiff, by bringing his bill in a federal district other than that of which he is an inhabitant or has a regular and established place of

business, does not, by so doing, consent to being sued in such district upon an equitable counterclaim, unless the matter set up therein arises out of the transaction complained of in the plaintiffs' bill. Colman v. American Warp Drawing Machine Co. (D. C.) 235 F. 531 (D. C. Mass.); Parker Pen Co. v. Rex Mfg. Co., 11 F.(2d) 533 (D. C. R. I.). The chief reason assigned for this holding seems to be that if a plaintiff, by bringing his bill in a district other than the one in which he resides or has a place of business, should be held to have consented to being sued there on a counterclaim unrelated to the plaintiff's cause of action, it would be to enlarge by rule the jurisdiction of the court, and that such a thing cannot be done.

The defect in this argument seems to us to be that it assumes that the statutory jurisdiction of the court is thus enlarged by a rule of court. This plainly is not so. A person who is not an inhabitant of, or does not have a regular and established place of business in, a given federal district, may by his consent, express or implied, be sued in a patent cause in such district. Postage Meter Co. v. Standard Mailing Machine Co. (C. C. A.) 9 F.(2d) 19. And if, by bringing a suit in equity in such district, he may be held to have consented to be sued there on a counterclaim setting up matter arising out of the same transaction (as appears to be conceded), there seems little reason, since the promulgation of equity rule 30, for not holding that by so doing he likewise consents to being sued on a counterclaim based upon an independent and unrelated matter, and such is the holding in many Circuit Courts of Appeals and District Courts. United States Expansion Bolt Co. v. Kroncke Hardware Co., 234 F. 868, 870, 148 C. C. A. 466 (7th Cir.); Id. (in court below) 216 F. 186; Victor Talking Mach. Co. v. Brunswick-Balke-Collender Co. (D. C.) 279 F. 758; Champion Spark Plug Co. v. Champion Ignition Co. (D. C.) 247 F. 200.

[3] Furthermore, we are of the opinion that the appellant (the Krentler Company) cannot question the power of the court in the Massachusetts district to entertain the counterclaim of Belcher, for it appeared generally by counsel, filed an answer to the counterclaim and submitted to a trial and decision of the case upon its merits. The matter involved in the counterclaim being a patent suit, the District Court, as a federal court, had general jurisdiction of the subject-matter, and the appellant, by appearing generally, filing an answer, going to trial, and sub-

13 F.(2d)—51

mitting to a decision on the merits, waived the privilege which it now seeks to assert, if it had not otherwise done so. Postage Meter Co. v. Standard Mailing Co., supra (1st Cir.); Cooling Tower Co. v. C. F. Braun Co. (C. C. A.) 1 F.(2d) 178, 179 (9th Cir.). In fact, it failed to take any action seeking to raise this question until February 18, 1925, some seven or eight months after the trial and decision on the merits of the case. Such being the situation, we think there can be no question but that the appellant should be held to have waived its right, if any, to object to being sued in the Massachusetts district by way of counterclaim on the Peterson patent.

[4] The third contention is that the counterclaim abated before the trial in June, 1924, and consequently there never has been a trial on the counterclaim. In support of this contention the appellant relies upon the matter set out in its suggestion of abatement filed February 12, 1925, to the effect that a corporation by the name of the George E. Belcher Company was organized under the laws of Massachusetts, with which Belcher made the contract of April 1, 1924, heretofore set out, wherein he assigned to the corporation the assets of the business theretofore conducted by him, including patents used by him in his business, in consideration of the issue to him of 4,997 shares of the 5,000 authorized shares of common stock of the corporation; that the Peterson patent, set up in the Belcher counterclaim, was a patent used by him in his business, and constituted one of the principal features of his business.

It appears that, at the time Belcher filed his answer, November 24, 1923, setting up the counterclaim, he was the owner of one-half of the Peterson patent, and held an exclusive right and license from Peterson "to make, use, and sell, or cause to be made and sold," the invention under the other half for the full term of the patent, and that it was agreed between the parties thereto that the license and all rights therein and thereunder should be binding upon their "heirs, executors, administrators, and assigns, and legal representatives."

In view of these facts, the question arises as to what was Belcher's title to the Peterson patent when he brought his counterclaim, and on April 1, 1924, when he made the agreement with the Belcher Company—that is, whether, as a matter of law, he was the owner of the entire title to the Peterson patent, or only owned a half of it, and was licensee under the other half.

In Waterman v. Mackenzie, 138 U. S. 252, 255, 11 S. Ct. 334, 34 L. Ed. 923, the court, in considering a similar question, held that an assignment or transfer of an undivided part of the exclusive right to *make, use, and vend* throughout the United States a patented invention vested in the assignee title to so much of the patent itself, with a right to sue infringers; that the patentee assignor was to be joined as a party, where he retained title to the other share of the patent; that, where the transfer amounted to a license only, the title remained in the owner of the patent, and suit must be brought in his name, and never in the name of the licensee alone, unless that was necessary to prevent an absolute failure of justice, as where the patentee was the infringer and could not sue himself. It was there said:

"Every patent issued under the laws of the United States for an invention or discovery contains 'a grant to the patentee, his heirs and assigns, for the term of 17 years, of the exclusive right to make, use and vend the invention or discovery throughout the United States and the territories thereof.' Rev. Stat. § 4884 [Comp. St. § 9428]. The monopoly thus granted is one entire thing, and cannot be divided into parts, except as authorized by those laws. The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, first, the whole patent, comprising the exclusive right to make, use and vend the invention throughout the United States; or, second, an undivided part or share of that exclusive right; or, third, the exclusive right under the patent within and throughout a specified part of the United States. Rev. Stat. § 4898 [Comp. St. § 9444]. A transfer of either of these three kinds of interest is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers—in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement."

See, also, Union Switch & Signal Co. v. Johnson Railroad Signal Co., 61 F. 940, 10 C. C. A. 176; Chauche v. Pare, 75 F. 283, 21 C. C. A. 329; Paulus v. M. M. Buck Mfg. Co., 129 F. 594, 64 C. C. A. 162.

[5] As the instrument purporting to be a license was a grant to Belcher, his heirs and assigns, of the exclusive right, under one-half of the Peterson patent, to make, use,

and vend the invention throughout the United States for the entire term of the patent, it transferred and vested in Belcher the title to that half, and, being the owner of the other half, Belcher was at the time of the filing of his counterclaim and the making of the agreement of April 1, 1924, the owner of the entire title to the patent. This being so, we think the legal effect of the instrument of April 1, 1924, construed in the light of the surrounding circumstances, was to transfer the entire title in the Peterson patent from Belcher to the Belcher Company, but that there still remained in Belcher the right to maintain an action to recover profits made by the Krentler Company and damages suffered by him by reason of the infringement of the Peterson patent down to the time of the sale and transfer to the Belcher Company, and that the instrument of April 1, 1924, cannot reasonably be construed as transferring to the Belcher Company the right to such profits and damages. As Belcher, at the time he brought his counterclaim, had the legal title to the patent and a right to all the profits and damages that might have arisen or accrued from past infringement, and to equitable relief against further infringement, the counterclaim was a proper equitable counterclaim of which the court had jurisdiction in equity, and, having taken jurisdiction in equity, it did not thereafter lose it on April 1, 1924, when Belcher parted with his title to the patent. And as the agreement of April 1, 1924, did not pass the right to damages and profits for past infringement, it did not operate to abate or suspend the counterclaim, and the court had jurisdiction of the cause at the time of the trial and decision of the merits of the case.

[6] After the decision was handed down on July 24, 1924, Belcher died, and Leman, having been appointed administrator, was substituted for Belcher and the suit revived. Thereafter, on December 11, 1924, Leman, administrator, executed and delivered to the Belcher Company the deed of assignment heretofore set out. The deed purported to be an assignment of the one-half interest in the Peterson patent which Peterson had assigned to Belcher March 2, 1915, and therein, in addition to assigning or purporting to assign said one-half interest, Leman further assigned to the Belcher Company all such "rights of actions, claims for damages, profits and costs" which he, as administrator, had against any and all persons, firms, corporations, or associations, at law or in equity, by

reason of past infringements of the "rights conveyed" under said Peterson patent.

It is evident that this instrument did not operate to pass title to this half of the Peterson patent, as it had been previously transferred by Belcher April 1, 1924. It did, however, assign damages and profits due to past infringements of the one-half interest attempted to be conveyed, and it would seem that, under the assignment, all damages which Belcher sustained in his business in the operation of the patent due to past infringements would pass to the Belcher Company under the assignment; for, whether Belcher had operated his business under the one-half interest in the Peterson patent, which the Leman assignment purported to transfer, or under his complete title to the patent, the damages suffered by him would be the damage to his business. · But, as the assignment of December 11, 1924, limited the profits to those due to past infringements of "the rights conveyed" thereby, it seems to us that only such profits passed as appertained to that one-half interest.

This being so, the counterclaim suit, as related to the profits that accrued prior to April 1, 1924, pertaining to Belcher's one-half interest under the so-called exclusive license, was not suspended by the assignment of· Leman of December 11, 1924, for such part of the profits did not pass to the Belcher Company, but it was suspended as to the right to damages and to the balance of the profits. As Leman and the Belcher Company were the parties in interest under the counterclaim as to the profits, and the company as to the damages, accruing and arising prior to April 1, 1924, the court below did not err in allowing the Belcher Company to intervene as a party counterclaimant and permitting the counterclaim to be revived as to it; nor did it err in holding that, as the Belcher Company had become the owner of the Peterson patent, it was entitled to equitable relief. Denaro v. McClaren Products Co. (C. C. A.) 9 F.(2d) 328.

We are, however, of the opinion that it erred in allowing the intervention of Peterson as a counterclaimant, as he had no title to the patent, and no interest in the damages or profits.

As the parties have argued the case upon the merits, and we regard the record as sufficient to authorize a disposition of the case, we have undertaken to do so under the authority vested in us under section 129 of the Judicial Code.

The two patents involved in the Krentler Company's bill of complaint are the Krentler patent, No. 842,319, and the Carl patent, No. 969,244. They both relate to lasts used in the manufacture of shoes. The court below did not pass upon the validity of the Krentler patent, but held that it was not infringed by the defendant Belcher. The Carl patent was held invalid for want of invention.

[7] In the Krentler patent, the patentee states that his invention relates to hinged or divided lasts, and more particularly to the provision for locking or holding the last against movement into broken position; that a last in use has a strong tendency to move into an intermediate or broken position, and that his invention relates to means for preventing this movement; that "said means consists in providing an angular projection or wedging surface $c^1$ on one part of the last herein shown as on the rear end or secant face of the fore part, and a dwell or co-operating surface on the other part, herein shown as on the front end or secant face of the heel part, so that, when said two co-operating surfaces slide on each other in moving toward said intermediate position, they will offer increasing resistance, and will tend to hold the last parts rigidly in lengthened or shortened position"; that "the wedging surface or protuberance $c^1$ is secured by providing a bulge or enlargement on the knuckle $c$, slightly eccentric to the pivot pin $f$, on which the heel part turns, said heel part being sawed to fit said wedging surface $c^1$."

Further he says: "If the wedging or moving part were made concentric with the pivot pin $f$, there would be no point of special resistance; but by making it eccentric or providing it with a corner or obtuse angularity it co-operates with the opposing resisting surface to lock the last in operative position."

It was old to provide in a hinged last a knuckle joint, the contacting surfaces of which represented the circumference of a circle having the pivot pin $f$ for its center. And because of this the patentee in the Krentler specification limits his "claims to the species of contacting last faces having co-operating angular surfaces for securing the desired locking effects."

The broad claims of the patent are claims 1 and 2, and read as follows:

"1. A divided last, and a union movably connecting the parts of the last, one of said last parts having a rigid angular or wedging surface, and the other of said last parts having a co-operating rigid resisting surface, and constructed to maintain the parts at rest when the last is collapsed and to offer increasing resistance in moving away from collapsed position.

"2. A divided last, having adjacent contacting secant faces, and a union movably connecting the parts, a portion of one of said faces consisting of an angular or wedging surface, and a portion of the other of said faces consisting of a co-operating resisting-surface, said surfaces having a position of rest for automatically holding the last lengthened and being constructed to offer increasing resistance to moving away from lengthened position."

The angular wedging surface spoken of in the claims is "the angular projection or wedging surface $c^1$," or the "wedging surface or protuberance $c^1$" spoken of in the specification, and is secured by "providing a bulge or enlargement in the knuckle $c$ slightly eccentric to the pivot pin $f$." And as in his specification the patentee limits his claims "to the species of contacting last faces having co-operating angular surfaces for securing the desired locking effects," we do not think the District Court erred in holding that the claims of the patent were limited to a knuckle provided with a bulge or enlargement upon it slightly eccentric of the pivot pin, and that, so construed, the defendant's alleged infringing device (Plaintiff's Exhibits 3 and 4) do not infringe, as the knuckle joint employed does not contain or embrace the rigid angular or wedging surfaces that constitute the alleged inventive feature of the Krentler patent, but employs a knuckle joint, the surfaces of which at all points are concentric with the pivot pin $f$, a feature of the prior art. The increasing resistance feature, which counsel for the Krentler Company claim is the broad feature of the Krentler patent, was present in lasts provided with the old circular knuckle, and, unless the eccentric feature constituting the "bulge or enlargement of knuckle $c$" constitutes the invention of the Krentler patent, it is invalid. It is evident that the claims are not entitled to the broad construction claimed for them.

[8] In the Carl patent, the Krentler Company relies upon claim 1, which reads:

"1. A last comprising front and rear pivotally connected sections, one of said sections having a circular knuckle and the other a circular socket which receives said knuckle, said sections being constructed from a single block and the joint between said

sections comprising a part which is cut and another part which is broken."

The circular knuckle feature, as above stated, was old. In making the device of the Carl patent, the greater part of the circular divisional line forming its knuckle was cut; the balance of it, varying from one-eighth to one-fourth of an inch, was broken. The court below found, and we think correctly, that the method of making by breaking part of the divisional line, instead of sawing it, was a shop expedient, which had been practiced many years before in connection with the making of lasts, and that there was no invention in adopting such well-known expedient, whether it had been previously employed in making lasts, where the divisional line between the parts consisted in part of a line in the form of a true circle, or departed therefrom.

If the inventive feature of the Carl patent resided in the circular knuckle joint in combination with a shoulder, such combination was not new, for it is shown in the earlier patent to Holbrook No. 907,693, issued December 22, 1908. We do not think that the fact that an eighth to a quarter of an inch is formed by breaking, rather than sawing, involved invention, or that the court erred in finding that the Carl patent, as to claim 1, did not involve invention.

[9] We regard the Peterson patent for a hinged last, with its connecting horseshoe link and resilient spring in a single element, as valid and infringed. It was patentable over the Clausing patent, No. 1,085,668, not simply because it embodied a link and spring in a single element, while in the Clausing patent they were separate, but because it was so constructed that it functioned to hold the last firmly when in its collapsed as well as its extended position; the spring of the Clausing patent functioning to hold the last members firmly only when in their extended position. Although the link and spring of the plaintiff's alleged infringing device may, as to the number of elements involved, more nearly resemble Clausing, nevertheless in its functioning and mode of operation it resembles the Peterson patent, for the connecting spring and the link not only hold the last members in proper relation, but hold them firmly in both their extended and in their collapsed positions, as does the Peterson device. The plaintiff, by separating the Peterson device into two elements, does not escape infringement.

The decree of the District Court is modified, to conform to this opinion, and, as modified, is affirmed, with costs to the appellees.