opinion. Bruce, Judge: The first question for decision is whether Cold Metal was a corporation in existence for tax purposes in 1949. Petitioners contend that it was extinct, and respondent determined that it still had sufficient life to be chargeable with the receipt of income. Respondent contends that Cold Metal, by transferring its assets to the Trustee, merely turned its assets over to a receiver or trustee in liquidation which continued to operate the corporation, and, therefore, the corporation was still in existence, citing First Nat. Bank of Greeley, Colo. v. United States, (C. A. 10) 86 F. 2d 938; O'Sullivan Rubber Co. v. Commissioner, (C. A. 2) 120 F. 2d 845; United States v. Metcalf, (C. A. 9) 131 F. 2d 677, certiorari denied 318 U. S. 769; Louisville Property Co. v. Commissioner, (C. A. 6) 140 F. 2d 547, certiorari denied 322 U. S. 755; Pinkerton v. United States, (C. A. 7) 170 F. 2d 846; sec. 52 (a) of the Internal Revenue Code of 1939;[1] and Regs. 111, secs. 29.22 (a)-20 and 29.52-1. We cannot agree. In none of the cases cited were the assets distributed to the sole stockholder of the corporation, as was the case here, and in our opinion neither section 52 (a) nor the cited regulations contemplate that a sole stockholder who receives a distribution in kind should be considered as a receiver or trustee in liquidation. Respondent apparently recognizes that if the Trustee was acting for itself as the sole stockholder it was not a receiver or trustee in liquidation. He argues, however, that the alleged sale of stock to the Trustee, which made it the sole stockholder, was a sale in form only. Respondent asserts that for tax purposes substance prevails over form and that in substance the Trustee became a trustee in liquidation. The principal fallacy in respondent’s argument is that it ignores the Trustee’s ownership of 151 shares of Cold Metal stock prior to the acquisition of the remaining shares from the other stockholders. By obligating itself to pay the debts of Cold Metal and to pay the other stockholders up to $11,131,000 for their shares, it was assuming the risk that all of its shares, including the original 151 shares, might be rendered worthless if the funds received did not exceed Cold Metal’s debts and taxes,[2] future expenses to be incurred in connection with pending litigation, and the purchase price of the other 1,849 shares acquired. In addition, selling the shares to the Trustee permitted those stockholders who were willing to take less to get their money first. Also, by selling their stock to the Trustee, thus limiting the amount they could receive, all of the stockholders other than the Trustee were given greater assurance that they would receive a substantial sum for their stock and in a shorter period of time. This could not have been accomplished by a mere corporate transfer of the assets to a trustee in liquidation. Perhaps a similar result could have been accomplished by distributing the assets to the old stockholders of Cold Metal and having them convey the assets to á trustee under a trust agreement whereby the funds would be distributed as in the instant case. However, aside from the unreality of such an agreement where one stockholder receives nothing until the other stockholders have been paid in full, the trustee, which was taking the principal risk, might well have objected to someone other than itself administering the assets. Also, as was pointed out in the case of First Nat. Bank of Greeley, Colo. v. United States, supra, cited by respondent, where the assets are conveyed to the stockholders and then to a trustee, the trustee is normally the agent of the stockholders rather than the agent of the corporation. See also Acampo Winery & Distilleries, Inc., 7 T. C. 629. Therefore, in the instant case it cannot be said that the Trustee was in effect the agent of Cold Metal or that the salé of the stock to the Trustee lacked substance. Respondent contends in the alternative that, even if the Trustee was not a trustee in liquidation, Cold Metal continued to exist through the year 1949 under the laws of Ohio and was in existence for Federal income tax purposes. Unquestionably some life remained in Cold Metal in 1949 under the laws of the sovereign which brought it into being and determines the time of its death. Even after a corporation has filed a certificate of dissolution, the Ohio General Code, section 8623-80, provides: it shall continue for the sole purpose of paying, satisfying and discharging any existing liabilities and obligations, collecting and distributing its assets and doing all other acts required to adjust, settle and wind up its business and affairs, and it may do all such acts and may sue and be sued in its corporate name. The question remains, however, as to whether Cold Metal was dead for tax purposes even though, living under the locpi law. Henry Hess Co., 16 T. C. 1363, revd. (C. A. 9) 210 F. 2d 553, is the only case cited which is in point, and we have found no other. Petitioner cites Carter v. Commissioner, (C. A. 2) 170 F. 2d 911, and Novo Trading Corporation v. Commissioner, (C. A. 2) 113 F. 2d 320, but in neither case was the question of corporate existence considered by the Court of Appeals. In the former case the question was not raised. In the latter case the Court of Appeals held there was a valid distribution in liquidation of the corporation; and, as the decision of the Supreme Court in Helvering v. Horst, 311 U. S. 112, had not yet been rendered, the Court of Appeals did not consider whether the income could be taxed to the corporation despite the distribution. See also Pat O'Brien, 25 T. C. 376, which deals with the question of corporate existence, but in that case the corporation did not perform any function after its dissolution and the possibility of its continuing existence was not considered. Cf. Herbert v. Riddell, 103 F. Supp. 369. In Henry Hess Co., supra, a vessel owned by a corporation was requisitioned for title by the War Shipping Administration in 1942, and the corporation thereby acquired a claim against the War Shipping Administration for just compensation. Later in 1942 the corporation dissolved and distributed its assets, including the claim for payment for the requisitioned vessel, to its sole stockholder. Thereafter the corporation could perform any act required to wind up its affairs and could sue and be sued. In 1943 and 1944 the payments for the requisitioned vessel were received in the name of the corporation and the corporate name appeared upon all agreements and documents in connection with the said claim. The War Shipping Administration required that the corporate name be used because it took the position that the claim involved was a claim against the United States which could not be assigned. On the above facts this Court held that the corporation was still in existence for tax purposes in 1943 and 1944. The facts in the instant case are very similar. While Cold Metal did not actually receive any payments during 1949, it was a party to 15 different legal proceedings in that year, including those proceedings wherein most of the income in question was ordered paid to the Trustee. It was the sole plaintiff in two of these actions and was the sole defendant in another. In that year, 1949, it was made a plaintiff in two actions filed against the United States for the same reason the corporation was made party to the agreements and documents in the Henry Hess Co. case. We think these facts require the same holding as in the Henry Hess Co. case, and therefore we rule that Cold Metal was in existence for tax purposes during 1949. Where the corporate entity is still used so extensively in aiding its stockholders to realize on claims which it has assigned to them, to borrow the words of Justice Douglas in the case of United States v. Joliet & Chicago R. Co., 315 U. S., 44, 48 (1942), “The umbilical cord between it and its stockholders has not been cut.” We realize that the above holding is contrary to the opinion of the United States Court of Appeals for the Ninth Circuit in the Henry Hess Co. case; but with all due respect to that learned court, we feel that our decision in the Hess case was correct. In reversing this Court, the Court of Appeals' relied primarily upon Treasury Regulations 111, section 29.52-1, which provides: Seo. 29.52-1. Corporation Returns. — Every corporation not expressly exempt from tax must make a return of income, regardless of the amount of its net income. * * * A corporation having an existence during any portion of a taxable year is required to make a return. If a corporation was not in existence throughout an annual accounting period (either calendar year or fiscal year), the corporation is required to make a return for that fractional part of a year during which it was in existence. A corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs, such as for the purpose of suing and being sued. If the corporation has valuable claims for which it will bring suit during this period, it has retained assets, and it continues in existence. A corporation does not go out of existence if it is merely turned over to receivers or trustees who continue to operate it. * * * [Emphasis supplied.] The italicized portion of the above regulations was added by T. D. 5247,1943 C. B. 216, 224, in order to conform Regulations 103 to section 135 (c) of the Revenue Act of 1942. Section 135 (c) of the 1942 Act amended section 47 of the 1939 Code by adding the following subsection: Seo. 47. Returns for a Period of Less Than Twelve Months. (g) Returns Where Taxpayer Not in Existence for Twelve Months. — In the ease of a taxpayer not in existence during the whole of an annual accounting period ending on the last day of a month, or, if the taxpayer has no such annual accounting period or does not keep books, during the whole of a calendar year, the return shall be made for the fractional part of the year during which the taxpayer was in existence. In describing this amendment both the House Ways and Means Committee (H. Kept. No. 2833, 77th Cong., 2d Sess., pp. 88, 90) and the Senate Finance Committee (S. Kept. No. 1631, 77th Cong., 2d Sess., pp. 105, 106) use substantially identical language. H. Kept. No. 2333, swpra, provides: Subsection (c) of this section is a technical amendment to section 47 of the Internal Revenue Code to define the period covered by the return of a taxpayer which was not in existence throughout a calendar year or fiscal year, on the basis of which its return would otherwise be made. Under existing law, such taxpayers must make a return for such period as the Commissioner requires under administrative regulations, or, in the absence of regulations, for the calendar or fiscal year, but it is now believed proper to provide uniform treatment for all such taxpayers by requiring return only for the period during which the taxpayer was in existence. Returns under this subsection will not be placed on an annual basis for income tax purposes, since they are not for the short period described in section 47 (a), which only applies to short periods caused by a change in accounting with the approval of the Commissioner. In the case of a corporate taxpayer, the corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with the winding up of its affairs, such as for the purpose of suing and being sued. If the corporation has valuable claims for which it will bring suit during this period, it has retained assets, and it continues in existence. Of course, a corporation does not go out of existence if it is merely turned over to receivers or trustees who continue to operate it. The above committee reports and, consequently, that portion of the above regulations added by T. D. 5247, supra, are concerned with defining the period to be covered by the return of a corporation “not in existence” throughout the taxable year, and the definition of a corporation “not in existence” is wholly subsidiary to that end. Apparently, the primary purpose of the above amendments to the statute and regulations was to prevent a corporation from spreading income over a full taxable year where the income is earned during the first few months of that year and the corporation is then dissolved with no prospect of future income* Cf. Kamin Chevrolet Co., 3 T. C. 1076. There is nothing to indicate that it was intended by either amendment to exempt from taxation a corporation otherwise in existence and chargeable with the receipt of taxable income. Therefore, unless the corporation clearly falls within the above definition of a corporation “not in existence,” the above language should not be construed to grant such an exemption. Moreover where, as here, the corporation was a claimant in a number of suits pending or filed during the taxable year invloved, we do not think it clearly falls within the above definition of a corporation “not in existence” for said definition specifically states that a corporation is still in existence if it has valuable claims for which it will bring suit. For reasons hereinafter stated, the proceeds of the claims, at least in part, will be constructively received by the corporation even though it has assigned the right to the proceeds to its sole stockholder. The next question for decision is whether Cold Metal is taxable on all or any portion of the $15,438,220.71 received by the Trustee in 1949. Respondent determined that the full amount was taxable to Cold Metal, and petitioners contend that Cold Metal is not taxable on any portion thereof. In our opinion that portion of the $15,438,220.71 representing royalties and amounts paid for infringement of patents on production prior to December 29, 1945, the date of the assignment of the assets to the Trustee, is properly taxable to Cold Metal. This amount (over $12,000,000) represents income earned, although not accruable (Cold Metal Process Co., supra), prior to the date of the assignment; and under the holdings in such cases as United States v. Joliet & Chicago R. Co., supra; Helvering v. Eubank, 311 U. S. 122 (1940); Helvering v. Horst, supra; and Lucas v. Earl, 281 U. S. 111 (1930), said income or fruit is taxable to the tree on which it grew. Petitioners argue that the above cases are distinguishable from the case at bar. They contend that here Cold Metal assigned both the patents and the right to income [3] and that the doctrine of the above cases applies only where the transferor retains the agency which earns the income. We do not agree. While petitioners’ contention is correct with respect to income earned after the assignment, this Court has held that income which is earned prior to the assignment is taxable to the assignor even though he also transfers the agency which earned it. Estate of Bertha May Holmes, 1 T. C. 508 (appeal dismissed C. A. 2). Petitioners also contend that the theory of anticipatory assignment of income does not apply since there was no certainty that any part of the funds would be received because of the claims of the United States in the cancellation suit and in the royalty proceedings. Here again we do not agree. In this regard a case in point is Estate of S. W. Anthony, 5 T. C. 752, affd. (C. A. 10) 155 F. 2d 980. There the petitioner’s decedent and an oil company each owned an undivided one-half interest in an oil lease. The oil company drilled wells on the leased premises and made arrangements to sell the oil and gas to the Texas Company. A dispute arose because the decedent refused to pay the amount the oil company demanded as decedent’s share of the development and operating costs. As a result the oil company filed a lien with the Texas Company, and the latter impounded the sums due the decedent for oil and gas purchased. In 1937, the decedent gave his interest in the lease and in the impounded funds to his brother. At that time, because of the lien and the oil company’s demands, there was no certainty that more than a small portion of the impounded funds would be received. The oil company subsequently brought suit to recover one-half of the amount of its alleged development and operating costs which it had previously demanded. The parties finally settled this suit by agreeing that a specified amount (less than that demanded) should be paid to the oil company out of the impounded funds. Thereupon, in 1940, the funds impounded representing oil and gas purchased prior to decedent’s assignment in 1937 (less applicable development and operating costs) were paid to decedent’s brother and his assigns. This Court held that the said amount represented income attributable to the decedent and taxable to his estate in the year 1940 when it was received. Similarly in the case at bar the income which was earned during the period ending December 29,1945, was attributable to Cold Metal and was taxable to it when the income was received in 1949. See also Floyd v. Scofield, (C. A. 5) 193 F. 2d 594. With respect to income earned after December 29, 1945, no part of that income is attributable to Cold Metal as it assigned the patents which represented the tree on which the income subsequently grew. Estate of Bertha May Holmes, supra. The case of Commissioner v. Court Holding Co., 324 U. S. 331 (1945), cited by respondent, is dearly distinguishable. Here there was no sale of anything, and hence there were no proceeds of a sale arranged by Cold Metal to be attributable to that corporation. See Pat O'Brien, supra. The next question to be decided is whether the Trustee is liable at law[4] or in equity for the 1949 tax liability of Cold Metal. Section 311 of the Internal Revenue Code of 1939[5] sets forth the procedure for the assessment and collection of the “liability, at law or in equity, of a transferee of property of a taxpayer,” and specifically provides that the term “transferee” includes a “distributee.” The Trustee agrees that it is liable as a transferee at law for the 1949 taxes of Cold Metal if it assumed that obligation under the provisions of the “Assignment and Distribution in Kind” which it accepted on December 29, 1945. That instrument provides that the transfer of the assets to the Trustee was made “in consideration of the assumption and payment therefrom of all taxes and liabilities of said Corporation [Cold Metal].” By this provision the Trustee assumed liability for “all taxes” of Cold Metal, including the taxes in question. And, in our opinion, this provision was not limited to an assumption of the then existing tax liabilities by subsequent language in the instrument providing that the assignment was “* * * subject to all unpaid taxes and other outstanding liabilities * * Our holding that the Trustee was liable as a transferee at law precludes the necessity of deciding whether it was liable for the 1949 taxes of Cold Metal as a transferee in equity. But see Commissioner v. Western Union Telegraph Co., (C. A. 2) 141 F. 2d 774. The final question for decision is whether Cold Metal is entitled to a deduction in 1949 for interest in the amount of $1,237,176.68[6] paid to the collector of internal revenue in that year. This amount represented interest on a deficieny determined for the year 1945. Respondent contends that Cold Metal was not entitled to the deduction because it was contesting the deficiency. He argues that a taxpayer may not accrue as an expense, interest on the amount of an unpaid contested tax liability. He further argues that Cold Metal did not become entitled to the deduction by paying the interest (see G. C. M. 25298, 1947-2 C. B. 39) as the interest was paid by the Trustee. Petitioners do not contend that the interest was accruable, but take the position that if Cold Metal is chargeable with the receipt of taxable income in 1949, interest paid out of that income was paid by it. In our opinion petitioners’ contention is sound. The payment of the $1,237,-176.68 in interest was in effect made out of a fund in the amount of $9,749,000 which had been deposited with the Federal Reserve Bank pursuant to an order of the Court of Appeals. Practically all of the $9,749,000 represented payments on infringement claims arising prior to the assignment of the patents, and was, therefore, constructively received by Cold Metal when the fund was disbursed by the Federal Reserve Bank. On January 6, 1949, before an order was entered permitting the fund to be withdrawn, the Federal Reserve Bank was served with a notice of levy asserting that taxes and interest were owing from Cold Metal for the year 1945. For this reason the entire fund was not unequivocally paid to the Trustee at that time, but to the extent of $8,449,973.33 was used for the payment of said interest and taxes. Under the circumstances the interest was in effect paid by Cold Metal whether Cold Metal is considered as the actual payor (cf. United States v. Morris & Essex R. Co., (C. A. 2) 135 F. 2d 711; United States v. Warren R. Co., (C. A. 2) 127 F. 2d 134) or whether the payment was made by the Trustee on its behalf (cf. Arrowsmith v. Commissioner, 344 U. S. 6; Koppers Co., 3 T. C. 62, affd. (C. A. 3) 151 F. 2d 267; Norman Cooledge, 40 B. T. A. 1325). Reviewed by the Court. Decisions will be entered u/nder Buie 50. SEC. 52. CORPORATION RETURNS. (a) Requirement. — Every corporation subject to taxation under this chapter shall make a return, stating specifically the items of its gross income and the deductions and credits allowed by this chapter and such other information for the purpose of carrying out the provisions of this chapter as the Commissioner with the approval of the Secretary may by regulations prescribe. The return shall be sworn to by the president, vice president, or other principal officer and by the treasurer, assistant treasurer, or chief accounting officer. In cases where receivers, trustees in bankruptcy, or assignees are operating the property or business of corporations, such receivers, trustees, or assignees shall make returns for such corporations in the same manner and form as corporations are required to make returns. Any tax due on the basis of such returns made by receivers, trustees, or assignees shall be collected in the same manner as if collected from the corporations of whose bnslness or property they have custody and control. Respondent’s determination In tlie instant proceedings that the Trustee was liable as a transferee in the amonnt of $11,221,360.23 lUustrates the risk it was assuming. Here the Income was separated from the patents. An assignment of only the patents would not have transferred the right to royalties previously earned and the right to sue for past infringement. Krentler-Arnold Hinge Last Co. v. Leman, 13 F. 2d 796. Contrary to petitioner’s contention, the pleadings filed by respondent in Docket No. 33397 sufficiently raise the question of the Trustee’s transferee liability under section 311, Internal Revenue Code of 1939, both “at law” and “in equity.” SEC. 311. TRANSFERRED ASSETS. (a) Method op Collection. — The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid * * * (1) Tbansfbbbes. — The liability, at law or in equity of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter. * * * * * * ‡ Any such liability may be either as to the amount of tax shown on the return or as to any deficiency in tax. • *»**♦* (f) Definition of “Tbansfbebb.” — As used in this section, the term “transferee” includes heir, legatee, devisee, and distributee. Later In 1949 the Trustee paid an additional $10,395.04 in interest, which Cold Metal seeks to deduct, on a claimed deficiency In the tax of Cold Metal for the year 1943. The record is not technically complete with respect to when this item accrued; but, as respondent has offered to “adjust this matter on a Rule 50 computation,” it is unnecessary to discuss it at this time.