Sigurd N. Hersloff and Joseph J. Stern, as Trustees for the Stockholders of United States Asphalt Refining Company and The Interocean Oil Company, Dissolved Corporations, Petitioners, *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 3540-65, 3939-65. Filed August 3, 1966.

*Herbert Plaut*, for the petitioners.
*Henry L. Glenn*, for the respondent.

Arundell, *Judge:* Respondent determined that petitioners "are properly taxable as a corporation" and that there are deficiencies in

income tax for the calendar years 1960, 1961, 1962, and 1963 of $2,811.09, $2,929.81, $2,867.96, and $3,001.93, respectively.

The only error assigned by petitioners is as follows:

4. The error committed by the Commissioner is in assessing [determining] corporate income taxes on receipts by the Trustees for the Stockholders from assets formerly owned by the above-named corporations which were dissolved many years ago, United States Asphalt Refining Company (hereinafter referred to as Asphalt) in 1928, and The Interocean Oil Company (hereinafter referred to as Interocean) in 1937, and were not engaged in any corporate activity in the years 1960, 1961 and 1962 [and 1963].

Docket No. 3540–65 involves the years 1960, 1961, and 1962; docket No. 3939–65 involves the year 1963. Both proceedings were consolidated and submitted for decision on the facts admitted in the pleadings pursuant to Rule 30 of the Rules of Practice of the Court.

### FINDINGS OF FACT

Asphalt was incorporated under the laws of the State of South Dakota on September 5, 1911, and on October 22, 1928, pursuant to a decree of the Circuit Court of said State, it was dissolved and its charter annulled. All of Asphalt's capital stock at all times was owned by Interocean, and none of it was disposed of by Interocean other than by its dissolution.

Interocean was incorporated under the laws of South Dakota on December 6, 1912, and, according to the provisions of its certificate of incorporation, its charter expired in 1937 and was not extended.

Section 8819, S.D. Rev. Code (1919), as amended by 1927 Laws, ch. 76, provides:

*Trustees on Dissolution.* Unless other persons are appointed by the Court, the directors or managers of the affairs of any corporation at the time of its dissolution shall be trustees for the creditors and stockholders or members of such corporation, and have full power to settle its affairs, sell and convey its property, collect and pay the corporate debts, and divide among the stockholders and members the property, or the proceeds of the sale thereof, which remain after the payment of debts and necessary expenses; and for such purposes may maintain and defend actions in their own names by the style of the trustees of such corporation dissolved, naming it; and no action to which any such corporation is a party shall abate by reason of such dissolution.

Pursuant to this section, on October 22, 1928, as the then surviving directors of Asphalt, O. E. Thurber and Nils B. Hersloff became "trustees of the creditors and stockholders" of Asphalt. On December 6, 1937, they similarly became "trustees of the creditors and stockholders" of Interocean. Thereafter, on April 23, 1941, Thurber died, leaving Nils B. Hersloff as the sole surviving trustee.

On October 22, 1928, Asphalt had as an asset an award of the Mixed Claims Commission, United States and Germany, made on

August 13, 1926, in favor of Asphalt in the sum of $150,000 with interest at the rate of 5 percent per annum from November 11, 1918, to date of payment, which award represented the value of the interest of Asphalt as charterer of certain steamers lost through acts of Germany during World War I.

On December 6, 1937, Interocean had as an asset an award of the Mixed Claims Commission, United States and Germany, made on August 13, 1926, in favor of Interocean, in the sum of $447,000, with interest at the rate of 5 percent per annum from August 13, 1916, to date of payment, which award represented the value of the interest of Interocean as charterer of a certain steamer lost through acts of Germany during World War I. As stated in the notices of the awards, the granting of the awards did not mean immediate payment, as no funds as yet had been provided for the satisfaction of the claims.

Pursuant to section 2(b) of the Settlement of War Claims Act of 1928, the Secretary of the Treasury was authorized and directed to pay Asphalt $218,547.95, consisting of the principal of the award in the amount of $150,000, plus $68,547.95, representing interest on the $150,000 at the rate of 5 percent per annum from November 11, 1918, to January 1, 1928, and to pay Interocean $698,054.79, consisting of the principal of the award in the amount of $447,000 plus $251,054.79, representing interest on the $447,000 at the rate of 5 percent per annum from October 8, 1916, to January 1, 1928.

After the making of the said awards, litigation ensued by one Colby and one Brown, who had served as counsel for Interocean and Asphalt in the prosecution of the claims before the Mixed Claims Commission, in the then Supreme Court of the District of Columbia, with respect to the amount of their counsel fees to be paid out of the proceeds of the aforementioned awards, and pursuant to the settlement of such litigation, the court entered a decree dated August 4, 1931, which, among other things, provided that Colby and Brown should recover for legal services theretofore rendered, the sum of $131,020.39 from Interocean, Asphalt, and Thurber and Hersloff, as trustees, with reference to the sum of $454,560.45 already received by Interocean, Asphalt, and Thurber and Hersloff in part payment of the awards, and also with reference to the sum of $174,337.41 then available in the Treasury of the United States for further part payment of said awards; and that Colby and Brown should recover from the same corporations and trustees 21⅔ percent of all sums thereafter to be paid on account of principal and interest on said awards (exclusive of the $174,337.41, above mentioned, then ready for payment by the Treasury).

To assure the payment of such percentage in the future, the decree directed the Secretary of the Treasury and the Treasurer of the United States to deliver to Interocean, Asphalt, and the trustees all

checks and warrants in payment of said awards only through and in care of the Riggs National Bank of Washington, D.C., such bank to forward same to its New York City banking correspondent for endorsement by the payees and return to the bank to be cashed and disbursed as provided in said decree, that is, to pay to said Colby and Brown the 21⅔ percent as their fees and thereafter to pay the remainder of the sums so received to Interocean, Asphalt, and the trustees after the bank deducted its reasonable compensation.

The decree also provided that the payments to Interocean, Asphalt, and the trustees should be made by check of the bank to the order of Interocean, whose receipt should fully discharge and acquit the bank for all payments due Interocean, Asphalt, and the trustees, and that Interocean, Asphalt, and the trustees were perpetually enjoined from applying for, demanding of, or receiving from the United States or from any officer thereof any warrant, draft, check, or order in payment of the awards or any part thereof, otherwise than as provided for in said decree.

Thereafter and prior to February 21, 1939, the trustees of Asphalt and Interocean assigned an interest of 1⅛ percent in said awards to Walter M. Bastian and Harvey D. Jacob, the attorneys who represented them in the aforesaid litigation in the then Supreme Court of the District of Columbia, in payment of their fees as said attorneys.

Thereafter and on February 21, 1939, the trustees of Asphalt and Interocean assigned to (1) Ellwood M. Rabenold and others, constituting the law firm of Rabenold, Scribner and Miller, general counsel for the trustees, in payment for their legal services to the trustees, 10 percent of the net balance of said awards, together with interest thereon, after deducting therefrom the 21⅔ percent directed to be paid to Colby and Brown, and the 1⅛ percent assigned to Bastian and Jacob; and (2) Edward D. Brown and Edgar A. Pollack, constituting the law firm of Brown & Pollack, attorneys for the trustees in certain matters in payment for their legal services to the trustees, 5 percent of the net balance of said awards, together with interest thereon, after deducting therefrom the 21⅔ percent directed to be paid to Colby and Brown, and the 1⅛ percent assigned to Bastian and Jacob.

Payments on the awards were uncertain and contingent upon recoveries from German assets or from funds provided by Germany. On February 27, 1953, a debt settlement agreement was made with Germany, subsequently duly ratified, whereunder annual payments were to be made by Germany for the holders of awards, including the awards of Interocean and Asphalt, to a stated total amount over a period of 26 years, commencing April 1, 1953.

Since a time prior to 1956, the trustees (a) received payments on account of the awards through the Riggs National Bank of Washing-

ton pursuant to the decree of August 4, 1931, as and when there were funds available; (b) paid the bank fees, trustees' commissions, and amounts due attorneys pursuant to the decree and assignments hereinabove described; (c) set aside funds to meet any possible claim for corporate income taxes; and (d) divided and paid over the balance of the payments to the stockholders of Interocean pro rata.

The trustees paid corporate income taxes on the net income from such receipts for years prior to 1955 but contested liability for such taxes for the years 1949, 1953, and 1954 by suit in the U.S. Court of Claims to recover the taxes paid. The court denied such recovery, holding that the acts of the trustees, including certain unsuccessful activities to recover other assets, constituted corporate activities sufficient to make the trustees liable for corporate income taxes for those years (see *Hersloff* v. *United States*, 310 F. 2d 947, certiorari denied 373 U.S. 923).

On or about May 2, 1955, a letter was written on behalf of the trustees to the U.S. Treasury, with a proposed instrument of assignment of the awards to Nils B. Hersloff, the then surviving trustee, and two other persons, as trustees for the stockholders of the Interocean Oil Co., who then numbered about 19 persons or estates, but the Treasury, on December 13, 1955, declined the request, stating its reasons as follows:

The Treasury is not satisfied that Mr. Hersloff has authority to pass on his duties as statutory trustee to others. While the proposed assignment might be acceptable if consented to by all the interested parties the Treasury does not feel that it should, under the circumstances in this case, undertake to determine the identity of the interested parties and their legal capacity to consent.

Application was then made by the surviving trustee to the South Dakota court, and on February 27, 1956, the court made an order "that Sigurd N. Hersloff of Long Point, Oxford, Maryland, and Louis G. Bernstein of 25 Rosalind Place, Lawrence, Long Island, New York, be, and they are hereby, appointed *as trustees for the stockholders* of United States Asphalt Refining Company, a corporation, and The Interocean Oil Company, a corporation." (Emphasis supplied.)

A duly certified copy of said order was then furnished to the U.S. Treasury, *and the payments on the awards which, for all prior years, had been made to and in the name of the corporations, were then, in the year 1956 and each subsequent year, made to and in the name of said trustees as "Trustees for the Stockholders" of said corporations.*

On August 15, 1956, Nils B. Hersloff died, leaving the said Sigurd N. Hersloff and Louis G. Bernstein as the surviving trustees "for the stockholders." Later, Bernstein and his successor appointed by the court, died, and the present trustees are the said Sigurd N. Hersloff and Joseph J. Stern appointed by the court expressly as trustees "for

the stockholders" by order dated June 11, 1959, of the Circuit Court of South Dakota.

Since 1956 the sole activity of the trustees has been to receive annual payments on the awards and, after paying expenses, make distribution to the persons entitled thereto of their percentage interests in the proceeds of the awards and the balance to the stockholders and their successors in interest, except that, in view of the undetermined question of claims for corporate income taxes for years subsequent to 1955 (the litigation with respect to the years 1949, 1953, and 1954 not having been decided until December 1962), the trustees set aside from payments received on the awards certain sums to provide funds to meet any such claims for taxes and for legal expenses.

Petitioners in both docket numbers filed their tax returns for the years in issue at New York, N.Y., 10008.

#### ULTIMATE FINDINGS OF FACT

During the taxable years 1960 through 1963, both Asphalt (which had been dissolved in 1928) and Interocean (which had been dissolved in 1937) had ceased business, were without assets, were not being operated by the herein appointed trustees, and were no longer in existence for tax purposes.

#### OPINION

The question in these proceedings is whether Asphalt and Interocean, although dissolved, were still in existence during the years 1960 through 1963. Substantially this same question, with different facts, for the years 1949, 1953, and 1954 was before the U.S. Court of Claims in *Hersloff* v. *United States*, 310 F. 2d 947 (1962), rehearing denied Feb. 6, 1963, certiorari denied 373 U.S. 923, wherein the court held on the facts as they existed for the years 1949–54 that the two dissolved corporations were still in existence and subject to the Federal income tax as corporations.

The respondent contends that the decision of the Court of Claims is conclusive on petitioners in the present case under the principles of collateral estoppel, citing *Commissioner* v. *Sunnen*, 333 U.S. 591, and, if not, the said decision is controlling under the ordinary rule of stare decisis.

In the course of its opinion in *Sunnen* the Supreme Court said:

If the very same facts and no others are involved in the same case, a case relating to a different tax year, the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change. But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case.[7] Thus the second proceeding may involve an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an

independent examination of the legal matters at issue. It may then reach a different result or, if consistency in decision is considered just and desirable, reliance may be placed upon the ordinary rule of *stare decisis*. Before a party can invoke the collateral estoppel doctrine in these circumstances, the legal matter raised in the second proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment. * * * [Footnote omitted.]

Petitioners contend that the facts in the proceedings before us are different in several respects from the facts considered by the Court of Claims and that these differences command that our decisions herein be for the petitioners. These differences will be considered later in this opinion.

The years 1949 and 1953 were controlled by the 1939 Internal Revenue Code, and all subsequent years, including the years now before us, were and are controlled by the 1954 Code. In its opinion covering the years 1949, 1953, and 1954 the Court of Claims said:

The cases under the 1939 Code and regulation hold that after dissolution the corporation-in-liquidation continues for federal income tax purposes as a taxable entity in those instances in which its affairs are substantially unsettled, it possesses, sells or seeks assets, or its liquidating agents carry on any substantial activities on its behalf [5] [citing 12 cases in fn. 5]. * * * In view of the similarity of the statutory provisions and regulations, the test under the 1954 Code must be the same. * * *

The applicable section of the 1954 Code is section 6012, the material provisions of which are in the margin.[1] The applicable provisions of the regulations are also in the margin.[2]

The Court of Claims held that for the year 1954 the two dissolved corporations were still in existence for tax purposes and that the liquidating trustees were required to file returns for the corporations under the above provisions of the statute and regulations; and that the same was true for the years 1949 and 1953 under the 1939 Code and regulations.

---

[1] SEC. 6012. PERSONS REQUIRED TO MAKE RETURNS OF INCOME.
   (b) RETURNS MADE BY FIDUCIARIES AND RECEIVERS.—

   *    *    *    *    *    *    *

      (3) RECEIVERS, TRUSTEES AND ASSIGNEES FOR CORPORATIONS.—In a case where a receiver, trustee in bankruptcy, or assignee, by order of a court of competent jurisdiction, by operation of law or otherwise, has possession of or holds title to all or substantially all the property or business of a corporation, whether or not such property or business is being operated, such receiver, trustee, or assignee shall make the return of income for such corporation in the same manner and form as corporations are required to make such returns.

[2] Sec. 1.6012–2  Corporations required to make returns of income.
   (2) *Existence of corporation.* A corporation in existence during any portion of a taxable year is required to make a return. * * * A corporation is not in existence after it ceases business and dissolves, *retaining no assets,* whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs, such as for the purpose of suing and being sued. *If the corporation has valuable claims for which it will bring suit during this period, it has retained assets and therefore continues in existence.* A corporation does not go out of existence if it is turned over to receivers or trustees who continue to operate it. * * * [Emphasis supplied.]

It should be noted from the respondent's regulations that a dissolved corporation continues in existence after dissolution if assets are retained. Petitioners now argue that when the years 1949, 1953, and 1954 were before the Court of Claims, Interocean (the parent company) had certain potential assets, namely the so-called British claim and the "Azua property," and that whatever be the significance of the actions of the surviving trustee with respect to such potential assets,[3] *it was completely terminated in or prior to 1958.* We think there is merit in this argument. During the years that were before the Court of Claims, the trustees were sufficiently active in making efforts to realize on the British claim and the Azua property as to cause the court to apply that part of the regulation which provides that "If the corporation has valuable claims for which it will bring suit during this period, it has retained assets and therefore continues in existence." But prior to the years 1960–63 now before us, all of this had changed. The trustees were substantially different, a fact which we will consider, *infra*, and all claims in connection with the British Government and the Dominican Republic had completely terminated and were at an end in or prior to 1958. Therefore, *as far as these two claims are concerned*, it can no longer be said that the corporations have "retained assets" and therefore continued in existence within the provisions of the above-cited regulation.

It remains to be considered whether the two dissolved corporations during the years 1960–63 retained assets as far as the awards were concerned. During the years 1949–54, the Court of Claims considered these awards as being assets retained by the dissolved corporations for, under the decree of the Supreme Court of the District of Columbia, dated August 4, 1931, the awards were to be paid to and in the name of the corporations, which corporations through the trustees were to

---

[3] These potential assets are mentioned in the opinion by the Court of Claims, beginning at p. 949, as follows:

"When Interocean's charter expired in 1937, it had certain potential assets, two of which are now relevant.[1] The so-called "British claim" was against the British Government, which had requisitioned two tankers from Interocean in World War I, for paying charter hire at less than the market rate. In 1927, the State Department rejected the claim as invalid and refused to present it to Great Britain. Nevertheless, Interocean's attorneys persistently pressed it thereafter. A new claim was filed with the State Department in 1938 and actively pursued in the manner of such international claims. There were conferences in 1950, and the claim was again rejected in 1951. In 1956, Interocean's trustee referred the claim to a Washington attorney who investigated it and discussed it again with the State Department in March 1958. He reported to the general counsel for the trustees that the Department was willing to arbitrate the matter, but the general counsel decided to abandon it since previous arbitrations had held the rates paid by the British to be adequate. Another possible asset was the "Azua property", 15,000 acres of oil land and 150,000 acres of timberland, in the Dominican Republic; these appear to have been of little value, but the trustees made some efforts to realize on them; further investigation by the trustees' counsel in 1951 and 1952 revealed either that Interocean did not originally have title or that it had been lost through nonpayment of taxes or confiscation.[2] [Fn. 2 omitted.]

"[1] Asphalt had no assets, potential or actual, aside from the award by the Mixed Claims Commission."

pay the lawyers, the bank's fees, the trustees' commissions, set aside funds to meet any possible claim for corporate income taxes and any other expense. During the years 1960–63, this procedure was substantially changed. Originally, when these corporations were dissolved, the surviving directors, under South Dakota law, were appointed as "trustees of the creditors and stockholders" and retained that title *through the year 1955*. So, for the years before the Court of Claims, the official trustees were "trustees of the creditors and stockholders." About May 2, 1955, the then surviving trustee, Nils B. Hersloff, addressed a letter to the U.S. Treasury proposing that the two awards be assigned to the then surviving trustee and to two additional persons, all of whom would act solely as trustees "for the stockholders" of Interocean. The request was declined by the Treasury on December 13, 1955, for the reasons stated in our findings. Application was then made by the said surviving trustee to the South Dakota court and on February 27, 1956, that court made an order that Sigurd N. Hersloff and Louis G. Bernstein "be, and they are hereby, appointed as trustees for the stockholders" of Asphalt and Interocean. *A duly certified copy of this order was then furnished the Treasury, and thereafter, the payments on the awards, which for all prior years, had been paid in the name of the corporations, were then, in the year 1956 and each subsequent year, made to and in the name of said trustees as "Trustees for the Stockholders" of said corporations.*

We think that this change in the payment of the awards, which was agreed to by the Treasury, in every substantial way amounted to a transfer of the ownership of the two awards from the long dissolved corporations to the new "trustees for the stockholders" thus leaving the two dissolved corporations *without any "retained assets"* as that phrase is used in the above regulations; and that since the facts for the years 1960–63 have changed materially from the facts for the years 1949–54, we are free to consider anew the issue in this case on its merits. Cf. *CBN Corporation* v. *United States*, 364 F. 2d 393 (Ct. Cl. 1966), where instead of a change in facts there had been a material alteration in approach to the overall depletion question from the reasoning used in the prior case and, by reason of this change in the legal climate, the rigidity of collateral estoppel could not apply.

Considering anew the issue in this case, we are of the opinion that since both dissolved corporations had ceased business, were without assets, were not being operated by the newly appointed trustees, the dissolved corporations must be regarded as fully liquidated and no longer in existence for tax purposes. Accordingly, we hold that the Commissioner erred as was alleged by petitioners in their assignment of error previously set forth herein.

*Decisions will be entered for the petitioners.*