## O'SULLIVAN RUBBER CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 281.

Circuit Court of Appeals, Second Circuit.

June 6, 1941.

L. HAND, Circuit Judge, dissenting in part.

———◇———

Blake & Voorhees, of New York City (Peter V. D. Voorhees, Helen H. Robinson, and Samuel B. Stewart, Jr., all of New York City, of counsel), for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Arthur A. Armstrong, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

This is a petition for review of a decision of the Board of Tax Appeals, reported at 42 B.T.A. 721, which found a deficiency for 1935 in personal holding company tax of $4,198.37 and a penalty of $1,049.59.

■ In the disputed year petitioner was a dissolved corporation in process of liquidation. It sold its business of selling rubber heels and dissolved in 1932; since then it has not engaged in business, but has endeavored to liquidate as rapidly as possible. The original sales price, after defaults in payments, was reduced in 1935, and notes, bearing interest payable semi-annually and with serial maturities beginning in 1936, were taken for the unpaid balance of $340,000 due on the adjusted price. Prior to 1935 it had distributed in liquidation about $7 per share, but in that year, the amount available being small, it made no distribution. At least 80% of its income in 1935 was derived from interest, and at least 50% of its outstanding stock was owned by not more than five individuals. It came, therefore, directly within the definition of "personal holding company" in Section 351(b) (1) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 757, set out in a footnote,[1] unless it was not then a "corporation".

---

[1] "§ 351. Surtax on Personal Holding Companies

"(a) * * *

"(b) *Definitions.* As used in this title—

"(1) The term "personal holding company" means any corporation (other than a corporation exempt from taxation under section 101, and other than a bank or trust company incorporated under the laws of the United States or of any State or Territory, a substantial part of whose business is the receipt of deposits, and other than a life-insurance company or surety company) if—(A) at least 80 per centum of its gross income for the tax-

■ Petitioner's contention is that dissolution left it with only residual powers, essential to winding up its affairs, but destroyed its status as a "corporation" within the meaning of the statute. We do not agree that dissolution puts a corporation beyond taxability. In some contexts, it is useful to refer to a dissolved corporation as "civilly dead". But while analogies and metaphors are valuable (and, some writers say, indispensable) aids to thinking, they should be used cautiously and with due regard to their essentially fictional character; carried too far, they may paralyze thought. Under the law of New York, the state of its creation, a corporation which has filed a certificate of dissolution "shall continue", for stated purposes including the collection of assets, the payment of obligations, and other acts required to terminate its affairs and business. These are corporate purposes, contemplated as such from the birth of the corporation; the declining years of a corporation are part of its life; and it would be a strange doctrine that the fulfillment of those corporate purposes, which might, and did here, require a considerable stretch of time, is beyond the reach of a tax statute as broad in its scope as Section 351(b) (1). The operation of a going concern is not a condition precedent to tax liability. Petitioner suggests no reason why its position should be held so anomalous that it does not fit into a framework in which business units of every description, of long or short duration, must share in the cost of society. This is the price of existence. To the effect that, under such a statute, a dissolved corporation is to be regarded as alive, see Jaffee v. Commissioner, 2 Cir., 1930, 45 F.2d 679.

By section 13(a) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 668, a tax is levied upon the net income of "every corporation", and by section 52, 26 U.S.C.A. Int.Rev.Acts, page 683, a return must be made by "every corporation subject to taxation under this title." Article 22 (a)-21 of Regulations 86 shows that the administrative construction of the Act includes dissolved corporations in process of liquidation. See also article 52-2. This construction has been repeatedly sustained; see Northwest Utilities Securities Corp. v. Helvering, 8 Cir., 1933, 67 F.2d 619 and cases there cited. In addition, the regulation has been consistent since 1918, and the intervening reenactments of the law require that we accord to it great deference. Helvering v. Wilshire Oil Co., 1939, 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101. Since we conclude that petitioner remained a "corporation", for the purpose of Title I, § 1 et seq., of the Revenue Act, 26 U.S.C.A. Int.Rev.Acts, page 664 et seq., it is unnecessary to rely on the alternative ground suggested by the respondent, that petitioner or its liquidators constitute an "association," which by virtue of Section 801(a) (2), 26 U.S.C.A. Int.Rev.Acts, page 790, is to be treated as a corporation.

■ Being a corporation for the purpose of Title I, petitioner is also one for the purpose of Title IA, which imposed the personal holding company surtax in issue here. Section 351 refers to "any corporation," and by section 351(b) (4) this term "shall have the same meaning as when used in Title I." Petitioner does not suggest, nor can we find, any justification in the language for exempting it under Title IA without also exempting it under Title I.

■ But, urges the petitioner, the personal holding surtax was enacted to remedy the evil of the "incorporated pocket book," deliberately created to reduce the personal taxes of those who created them, and, therefore, to impose the tax upon a corporation in petitioner's position is a perversion of the Congressional purpose. We may assume that the taxpayer here was not deliberately aiming to relieve its stockholders from personal taxation. It is, however, abundantly clear that Congress, in correcting an evil, is not narrowly confined to the specific instances which suggested the remedy. "Of course, all personal holding companies were not conceived in sin—many were organized for legitimate personal or business reasons; but Congress has made little distinction between the goats and the sheep".[2] In enacting the very section being applied here, Congress was attempting to foreclose the defense, avail-

able year is derived from royalties, dividends, interest, annuities, and (except in the case of regular dealers in stock or securities) gains from the sale of stock or securities, and (B) at any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals."

[2] Rudick, Section 102 and Personal Holding Company Provisions of the Internal Revenue Code, 49 Yale L.J. (1939) 171, 203.

able under section 104 of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 509, that the accumulation of profits was responsive to a legitimate business need. See Committee on Ways and Means, 73d Cong., 2nd Sess., House Report No. 704, p. 12: "The effect of this system * * * is to provide for a tax which will be automatically levied upon the holding company without any necessity for proving a purpose of avoiding surtaxes." Cf. Committee on Finance, 73d Cong., 2nd Sess., Senate Report No. 558, p. 15. It is suggestive that an earlier revenue bill, that of 1928, proposed by the House Committee on Ways and Means, contained in section 104, a definition substantially identical with section 351 of the Act of 1934, but that it was stricken by the Senate because: "As in the case of all arbitrary definitions, the effect was to penalize corporations which were properly building up a surplus and to fail to recognize business necessities and sound practices." Committee on Finance, 70th Cong., 1st Sess., Senate Report No. 960, p. 12; cf. Committee on Ways and Means, 70th Cong., 1st Sess., House Report No. 2, p. 17. Having before us indisputable proof from the exactitude of Section 351 itself, reinforced by the Committee reports, that Congress wished to establish objective criteria for imposition of the tax, we cannot, by probing into corporate motives, undertake to relieve from the alleged harshness of a particular application of the statute. The Board of Tax Appeals, therefore, was correct in sustaining the deficiency asserted in personal holding company surtax.

■■ There remains the 25% penalty, imposed by virtue of section 291, 26 U.S. C.A. Int.Rev.Acts, page 750, for failure to file a return. The Commissioner argues that this penalty is made applicable to Title 1A by section 351(c), and that petitioner is liable therefor because it did not file the separate personal holding company surtax return required by Art. 351-8 of Regulations 86. If this regulation is valid, the facts that petitioner had no fraudulent intent and that its status was in substantial doubt do not excuse its non-compliance. See West Side Tennis Club v. Commissioner, 2 Cir., 1940, 111 F.2d 6. The regulation here involved is valid. A separate return has been explicitly authorized by Congress. Section 351(c) carried over to Title 1A the administrative provisions applicable to Title 1; one such provision is the requirement to file such returns as are prescribed by the Commissioner; Section 54(a), 26 U.S.C.A. Int.Rev.Acts, page 684. The designation of Title 1A as a "surtax" rather than as a "tax" is immaterial. Its original designation was "tax". The Senate removed the provisions now found in Title 1A from Title 1 and placed them in a separate title in order to make "plain that this is an additional graduated income tax, or surtax, on personal holding companies." Committee on Finance, 73d Cong., 2d Sess., Senate Report No. 558, p. 13. Finally, see Conference Report 73d Cong., 2d Sess., House Report No. 1385, p. 20, which says: "The Senate amendment provides for a separate return for the purposes of this surtax on personal holding companies * * * The House recedes on amendment no. 45." The tax under Title 1A has in common with the "surtax" under Title 1 only the fact that both are so denominated in order to capture the interest from partially tax-exempt bonds. Title 1A applies to a sharply limited group of taxpayers, which history has demonstrated require particular scrutiny. Even if there were doubt about the construction of Congress' plain language, we would be influenced by the fact that the requirement of a separate return is in complete harmony with the intent and purpose of Congress.

In Noteman v. Welch, 1 Cir., 1939, 108 F.2d 206, the First Circuit held that a separate return was required, and that a failure to file would subject the taxpayer to penalty. There the court relied partly on the fact that the taxpayer's return under Title 1 was an inadequate disclosure of the facts which would establish liability under Title 1A, namely, that the taxpayer's stock was closely held and that 80% of its income was derived from royalties, interest, etc. We prefer not to rest on that ground, since, if adequate disclosure in a return under Title 1 excuses failure to file under 1A, we fail to see why a taxpayer may not cure an inadequate disclosure by amending his Title 1 return. We need not decide whether a defective return, if properly amended, is sufficient to escape the penalty, but it may be indicated that an incomplete return is effective to start the running of the statute of limitations, Florsheim Bros. Dry Goods Co. v. United States, 1930, 280 U.S. 453, at page 462, 50 S.Ct. 215, 74 L.Ed. 542, and a similar rule may apply as to penalties. We surmise that the court in Noteman v. Welch felt

that an incomplete disclosure would seriously impair the proper administration of the revenue; we do not quarrel with this concern, but merely add the fact that even a complete disclosure in a Title 1 return,—which, for ought we know, may pass through wholly different channels—may well not be a satisfactory substitute for a separate return under Title 1A. The regulation was not merely literally authorized by the statute; its promulgation is practically justified as an important aid to administration of the statute by the agency to which Congress entrusted that administration. We cannot, accordingly, dismiss it as a purely formal device but must regard it as precisely the kind of ruling which Congress intended to authorize and with the attendant statutory consequences for non-compliance.

There is, therefore, no escape for this taxpayer from the penalty for failure to file the return required under Title 1A. See Beam v. Hamilton, 6 Cir., 1923, 289 F. 9. The result may be harsh; perhaps Congress should have given the Commissioner discretion, in appropriate circumstances, to abate the penalty, but whatever our sympathies, we are not permitted to amend the Act. Hartford-Connecticut Trust Co. v. Eaton, 2 Cir., 1929, 34 F.2d 128 arose under a differently worded statute which had received a different administrative interpretation.[3] Moreover there the taxpayer intended to comply with the statute but made the mistake of selecting the wrong form, while here there was no intention to comply.

The decision of the Board of Tax Appeals is affirmed.

L. HAND, Circuit Judge (dissenting in part).

I agree with my brothers as to all but the penalty; and as to that I also agree not to follow the reasoning in Noteman v. Welch, 1 Cir., 108 F.2d 206, because a return is still a return, however misleading it may be. In the absence of fraud no penalty is imposed upon an innocent taxpayer, however he may throw the Commissioner off the track; it falls only upon those who by failing to make any return at all have given him no lead which he can follow up. Given a lead and good faith, it rests upon him to check the return.

For this reason it seems to me that our decision is a triumph of letter over substance. It is true that the "undistributed adjusted net income" defined by § 351(b)(2) and (3) is not the "net income" used for the base of the normal tax; but it is computed from that income, and the tax is an income tax, and indeed even a "surtax," eo nomine. I can see no reason in substance to distinguish an innocent mistake as to it and an individual's mistake as to his surtax, except that an individual puts both in one return.

The justification for this is that § 351 (c) makes applicable to this surtax all the administrative provisions of Title I; and since that title requires a return, so must Title IA. Therefore there must be two returns, as the Commissioner has ruled. I raise no question as to the propriety of his ruling; but the statute did not compel it. If he had merely added to the return required by Title I the questions necessary for Title IA, it would clearly have been a compliance with § 351(c); and certainly no penalty could have been then imposed. We are imposing one only because he has found it administratively convenient to make two bites to this particular cherry. The penalty was not meant for that; it was imposed to punish delinquents; those who either deliberately, or from indifference, made no effort at all to pay their taxes, not those who merely misunderstood duties which they tried to discharge. By recourse to what even grammatically is a bit of by no means an inexorable verbal reasoning we are perverting it from that purpose.

[3] This court there noted that the statute imposed a penalty "in case of failure to make and file a return or list", and gave significance to the words "or list" as indicating a Congressional intent not to exact a penalty for failure to file a "return".