310 F.2d 947
 Sigurd N. HERSLOFF and Joseph J. Stern, Trustees on Dissolution, Pursuant to Section 8819 of the Compiled Laws of South Dakota, for the United States Asphalt Refining Company and Interocean Oil Company, Dissolved Corporations
v.
The UNITED STATES.
 No. 126-58.
 United States Court of Claims.
 December 5, 1962.
 Rehearing Denied February 6, 1963.
 
 Herbert Plaut, New York City, for plaintiffs. David C. Bastian, Washington, D. C., and Charles E. Scribner, New York City, were on the briefs.
 Conrad T. Hubner, Jr., San Francisco, Cal., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.
 DAVIS, Judge.
 
 
 1
 This refund suit concerns the status for income tax purposes, in 1949, 1953, and 1954, of two affiliated South Dakota corporations, United States Asphalt Refining Company and Interocean Oil Company, which had earlier been dissolved under the law of their incorporation. The plaintiffs' claim is that the two corporations were dead and buried in the taxable years, and therefore no longer subject to the federal income tax. The Government parries with the defense that the companies, though dissolved, were carrying on sufficient activities, through their liquidating trustees, to be deemed still in existence.
 
 
 2
 Asphalt was dissolved by a South Dakota court in 1928; Interocean's charter expired in 1937. Under South Dakota law providing for "trustees of the creditors and stockholders" of a dissolved corporation, two of the then surviving directors of Asphalt became such trustees on its dissolution in 1928; on the dissolution in 1937 of Interocean (Asphalt's parent), the same men became the trustees of that corporation. Thereafter, by a series of orders of the South Dakota court, successor trustees were appointed on the death of earlier trustees, so that the present plaintiffs, Sigurd N. Hersloff and Joseph J. Stern, are now the duly appointed trustees empowered to sue on the present tax claims.
 
 
 3
 These claims have their seed in the days of World War I. During that conflict both Asphalt and Interocean chartered steamers which were lost at sea through the acts of Germany. In August 1926, before the dissolution of either company, the Mixed Claims Commission — which was set up to arbitrate claims for the destruction by Germany of American property in the First World War (see Z. & F. Assets Realization Corp. v. Hull, 311 U.S. 470, 61 S.Ct. 351, 85 L.Ed. 288 (1941)) — made an award to both corporations for their lost vessels. The award to Asphalt was $150,000, with interest at 5 per cent from November 11, 1918, to the date of payment; Interocean's award was $447,000, with 5 per cent from August 13, 1916, to the date of payment. Under the arrangement between this country and the Weimar Republic, Germany was obligated to pay the amounts of such awards to the United States; but in 1926 no funds had as yet been provided for their satisfaction. Payments on the awards were authorized by the Settlement of War Claims Act of 1928, 45 Stat. 254, and under that Act and its amendments the Treasury, beginning in August 1928, made intermittent payments of principal and interest to the two corporations and, after their respective dissolutions, to the trustees. In February 1953 the United States concluded with Germany a debt settlement agreement under which Germany was to make annual payments on such awards to a stated total sum over a 26-year period, commencing on April 1, 1953, and ending in 1979. This case involves income taxes paid by the trustees, on behalf of Asphalt and Interocean, on the interest on the original awards received in 1949, 1953, and 1954, and it may well have an impact on the plaintiffs' tax liability for the succeeding years as well.
 
 
 4
 During their long period of stewardship, the trustees have carried on certain activities and performed functions from which the parties draw differing conclusions. As the result of a suit for fees by the attorneys who represented Asphalt and Interocean before the Mixed Claims Commission, the District Court for the District of Columbia (then called the Supreme Court of the District) entered a compromise decree (in August 1931) which established the attorneys' right to recover from the corporations and the trustees a percentage of all amounts thereafter paid on the awards, with an equitable lien on all funds to be used for such payments. To enforce these rights, the decree, which was to bind all successors and all funds from which payments would be made, provided that the Treasury was to deliver payments on the awards to the companies and trustees only through the Riggs National Bank in Washington; that bank was to forward the check or warrant to its New York correspondent for endorsement by the payees (the trustees) and return it to Riggs to be cashed and disbursed as required by the decree, i. e., a percentage to the attorneys and the rest to the companies and trustees (through a check to Interocean which would discharge payments due Interocean, Asphalt (Interocean's subsidiary), and the trustees). The corporations and trustees were also enjoined from seeking from the Treasury payment in any other manner. In or before 1939, the trustees assigned various other portions of the payments on the awards to other attorneys who had rendered legal services to them. In the period before and including the taxable years involved here, the trustees received payment through the system set up by the 1931 decree — satisfying the bank fees, trustees' commissions, and sums due the various attorneys pursuant to the decree and assignments, and then paying over the balance to the stockholders of Interocean pro rata.
 
 
 5
 When Interocean's charter expired in 1937, it had certain potential assets, two of which are now relevant.[1] The so-called "British claim" was against the British Government, which had requisitioned two tankers from Interocean in World War I, for paying charter hire at less than the market rate. In 1927, the State Department rejected the claim as invalid and refused to present it to Great Britain. Nevertheless, Interocean's attorneys persistently pressed it thereafter. A new claim was filed with the State Department in 1938 and actively pursued in the manner of such international claims. There were conferences in 1950, and the claim was again rejected in 1951. In 1956, Interocean's trustee referred the claim to a Washington attorney who investigated it and discussed it again with the State Department in March 1958. He reported to the general counsel for the trustees that the Department was willing to arbitrate the matter, but the general counsel decided to abandon it since previous arbitrations had held the rates paid by the British to be adequate. Another possible asset was the "Azua property", 15,000 acres of oil land and 150,000 acres of timberland, in the Dominican Republic; these appear to have been of little value, but the trustees made some efforts to realize on them; further investigation by the trustees' counsel in 1951 and 1952 revealed either that Interocean did not originally have title or that it had been lost through nonpayment of taxes or confiscation.[2]
 
 
 6
 On these facts we are to decide whether Interocean and Asphalt were subject to the corporate income tax in 1949, 1953, and 1954. That issue is to be determined by federal, not state, law. Ochs v. United States, Ct.Cl., 305 F.2d 844, 847.[3] The first two of the taxable years (1949, 1953) are governed by the Internal Revenue Code of 1939, the third (1954) by the 1954 Code. Both statutes (Sec. 52(a), 1939 Code; Sec. 6012(b) (3), 1954 Code) provide in substance that, where receivers, trustees in bankruptcy, or assignees hold or operate the property or business of the corporation, the receivers, trustees, or assignees shall make returns and pay taxes for the corporation in the same manner and form as are required of corporations.[4] The controlling regulations under the 1939 Code (Treas.Reg. 111, Sec. 29.22(a)-20, and Treas.Reg. 118, Sec. 39.22(a)-20) declared, under the heading "Gross income of corporation in liquidation," that on dissolution the "corporate existence is continued for the purpose of liquidating the assets and paying the debts, and such receiver or trustees [i. e., receiver or trustees in dissolution] stand in the stead of the corporation for such purposes. * * * Any sales of property by them are to be treated as if made by the corporation for the purpose of ascertaining the gain or loss. * * *" The comparable regulation under the 1954 Code (Treas.Reg. on Income Tax, 1954 Code, Sec. 1.336-1, "General rule on liquidation of corporation") provides that "* * * gain or loss is recognized to a corporation on all sales by it, whether directly or indirectly (as through trustees or a receiver)" — with one exception not now relevant.
 
 
 7
 The cases under the 1939 Code and regulation hold that after dissolution the corporation-in-liquidation continues for federal income tax purposes as a taxable entity in those instances in which its affairs are substantially unsettled, it possesses, sells or seeks assets, or its liquidating agents carry on any substantial activities on its behalf.[5] As the Second Circuit put it in O'Sullivan Rubber Co. v. Commissioner, 120 F.2d 845, 847 (1941), "the collection of assets, the payment of obligations, and other acts required to terminate its affairs and business" are "corporate purposes, contemplated as such from the birth of the corporation; the declining years of a corporation are part of its life; * * *." For tax purposes such liquidation by a receiver or a trustee-on-dissolution "is treated as a continuation of the corporate business." J. Ungar, Inc. v. Commissioner, 244 F.2d 90, 92 (C.A. 2, 1957); Fairfield S. S. Corp. v. Commissioner, 157 F.2d 321, 323 (C.A.2, 1946), cert. denied, 329 U.S. 774, 67 S.Ct. 193, 91 L.Ed. 665. In view of the similarity of the statutory provisions and regulations, the test under the 1954 Code must be the same. The necessary corollary under both Codes is that income received by the trustees during such a period of continued corporate existence must be reported as the corporation's income.
 
 
 8
 In the perspective of the entire history of the trustees' tenure as well as from the standpoint of their functioning during the taxable years, we must regard the activities of the plaintiffs (and their predecessors as trustees-on-dissolution), considered together with the status of the corporate affairs, as more than sufficient under the accepted test to show that the corporations remained in existence. The record proves that the companies were far from wholly dormant; they had and claimed assets; they made some efforts to realize on their claims; they had certain debts; and they regularly distributed monies to attorney-creditors as well as to stockholders. In particular, from 1928 to 1958, the companies and the trustees received 29 separate payments on the awards of the Mixed Claims Commission; over the years since 1931 they made regular payments to lawyers who had served the companies prior to dissolution or thereafter; in the early 1930's they defended a suit by some of these attorneys for compensation; they pursued the "British claim" on various occasions from 1927 to 1958, and similarly made intermittent attempts to obtain a return on the "Azua property" in the Dominican Republic until about 1952. (The trustees also obtained commissions for their activities.) The other side of the coin is that the companies were not yet substantially debtfree — they owed monies to the attorneys who had represented them before the Mixed Claims Commission, to those who had served them in the fee-litigation with the earlier counsel, and to the attorneys who aided the trustees in the course of administration.[6] Most of this was specifically true of the companies in the particular taxable years (1949, 1953, and 1954); the only noteworthy exception is that in the latter two the Dominican Republic property had apparently been written off. Whatever the precise minimal standard for marking continued corporate existence for income tax purposes, the activities and condition of Asphalt and Interocean were measurably above the line in the years involved here.
 
 
 9
 The plaintiffs suggest that this standard should not be applied to Asphalt and Interocean because the 1931 decree ending the litigation with their attorneys forecloses the trustees from fully liquidating the companies and distributing all the remaining assets to the stockholders. We are far from convinced that the District Court could not be persuaded for good cause to alter the terms of its decree,[7] but in any event the 1931 decree is simply a hard fact of these companies' corporate life which requires them to stay alive longer than they wish. "The operation of a going concern is not a condition precedent to tax liability. Petitioner suggests no reason why its position should be held so anomalous that it does not fit into a framework in which business units of every description, of long or short duration, must share in the cost of society. This is the price of existence." O'Sullivan Rubber Co. v. Commissioner, supra, 120 F.2d at 847.
 
 
 10
 We point out, finally, that the decisions plaintiffs cite, in which dissolved corporations were held no longer liable for income tax, did not concern a live corporate status or activities of the kind we have here, but rather companies which had been fully liquidated. In Novo Trading Corp. v. Commissioner, 113 F.2d 320 (C.A.2, 1940), all the corporate assets had been distributed to the stockholders, the company had paid all its debts, carried on no affairs, and remained completely dormant although not legally dissolved; a subsequent refund of customs duties was therefore held not to be income to the corporation. United States v. Horschel, 205 F.2d 646 (C.A.9, 1950), and Telephone Directory Advertising Co. v. United States, 142 F.Supp. 884, 135 Ct.Cl. 670 (1956), both involved corporations which had already conveyed all their assets to their stockholders; there were no liquidating trustees, no debts, no business being settled, and no claim that the corporations remained in existence. The cases turned on the Government's attempt to tax certain income to the companies on the ground that the prior distribution of the assets had amounted to an anticipatory assignment of income already earned by the corporations. For a similar case, see United Mercantile Agencies v. Commissioner, 34 T.C. 808 (1960).[8] In Commissioner v. Henry Hess Co., 210 F.2d 553 (C.A.9, 1954), the corporation had likewise distributed to its stockholders all its assets, including a claim against the War Shipping Administration, but that agency erroneously refused to make payment on the claim to anyone other than the company, which immediately handed over the money to the shareholders; on these facts the court held that the company, which was in fact fully liquidated, could not be said to have continued its existence just because of the Government's mistaken insistence on treating it as such. The present case is also different from Cold Metal Process Co. v. Commissioner, 247 F.2d 864, 873-874 (C.A.6, 1957), in which the corporation had distributed all its assets and had no debts or disbursements; after dissolution, the remaining stockholder brought suit or maintained existing suits, using the corporate name, on claims arising out of pre-dissolution activity; the court found, however, that these actions were solely for the benefit of the stockholder and not in the corporation's "own right." Here, the course of continued corporate conduct is significantly greater.
 
 
 11
 The plaintiffs are not entitled to recover and their petition is dismissed.
 
 
 12
 JONES, Chief Judge, and DURFEE, LARAMORE and WHITAKER, Judges, concur.
 
 
 
 Notes:
 
 
 [1]
 Asphalt had no assets, potential or actual, aside from the award by the Mixed Claims Commission
 
 
 [2]
 Another asset, the "Carteret property" in New Jersey, is not now pertinent because it was finally disposed of in 1947, prior to the earliest taxable year (1949) in the present case
 
 
 [3]
 The South Dakota statute (see finding 2) provides that the trustees of the corporation on dissolution "have full power to settle its affairs, sell and convey its property, collect and pay the corporate debts, and divide among the stockholders and members the property, or the proceeds of the sale thereof, which remain after the payment of debts and necessary expenses." South Dakota Session Laws 1927, c. 76
 
 
 [4]
 The differences in wording between the two Codes are not significant for the present case
 
 
 [5]
 See Taylor Oil & Gas Co. v. Commissioner, 47 F.2d 108, 109 (C.A.5, 1931); Burnet v. Lexington Ice & Coal Co., 62 F.2d 906, 909 (C.A.4, 1933); Hellebush v. Commissioner, 65 F.2d 902, 903-904 (C.A.6, 1933); Northwest Utilities Securities Corp. v. Helvering, 67 F.2d 619, 621-622 (C.A.8, 1933); Whitney Realty Co. v. Commissioner, 80 F.2d 429, 430-31 (C.A.6, 1935); Tazewell Electric Light & Power Co. v. Strother, 84 F.2d 327, 328, 330 (C.A.4, 1936); First Nat. Bank of Greeley, Colo. v. United States, 86 F.2d 938, 941 (C.A.10, 1936); O'Sullivan Rubber Co. v. Commissioner, 120 F.2d 845, 847 (C.A.2, 1941); Fairfield S.S. Corp. v. Commissioner, 157 F.2d 321, 323 (C.A. 2, 1946), cert. denied, 329 U.S. 774, 67 S.Ct. 193, 91 L.Ed. 665; J. Ungar, Inc. v. Commissioner, 244 F.2d 90, 92 (C.A.2, 1957); Smith v. Commissioner, 26 B.T.A. 1178, 1184-1186 (1932); Caswell v. Commissioner, 36 B.T.A. 816, 823-824 (1937)
 
 
 [6]
 One attorney claims Interocean owes him part of a fee for representing it before the Internal Revenue Service in a tax matter, and he is holding Interocean stock as security
 
 
 [7]
 Plaintiffs say that they requested the Treasury Department to recognize assignments of future payments to trustees for the stockholders, but the Treasury was unwilling to honor such an assignment, at least in the absence of consent by all interested parties. However, there is no showing of any effort to have the District Court change its decree; we do not read the injunctive provisions of that order as in any way prohibiting application for its modification
 
 
 [8]
 Williamson v. United States, Ct.Cl., 292 F.2d 524, is a case of this type in which it was held that there was an impermissible anticipatory assignment of earned income by the dissolved corporation