**UNITED STATES of America, Plaintiff,**

v.

**McDONALD & EIDE, INC. and Frank A. Gunnip, Liquidating Trustee for the Benefit of the Share Equivalent Unit Holders of the Receivership Estate of McDonald & Eide, Inc., Defendants.**

Civ. A. No. 86–351–JLL.

United States District Court,
D. Delaware.

Sept. 21, 1987.

Michael C. Durney, Acting Asst. Atty. Gen. Tax Div., Edward J. Snyder and Michael J. Salem of the U.S. Dept. of Justice, Washington, D.C., and William C. Carpenter, Jr., U.S. Atty., and Edmond Falgowski, Asst. U.S. Atty., Wilmington, Del., for plaintiff.

Leonard S. Togman, Richard L. Horwitz and Thomas R. Pulsifer of Potter, Anderson & Corroon, Wilmington, Del., for defendants.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

## I. INTRODUCTION

The genesis of this action is a complaint filed by the United States of America ("the Government") alleging that the Internal Revenue Service ("IRS") erroneously issued income tax refund checks for the years 1982 and 1983 to McDonald & Eide, Inc. ("M & E"), in care of Frank A. Gunnip ("Gunnip"), Receiver for M & E.[1] (Docket Item ["D.I."] 1.) In response to the complaint, Gunnip filed an answer and counterclaim. The answer denied that the refund checks were erroneously issued and the counterclaim alleged that Gunnip, as the Receiver for M & E, is entitled to refunds of all corporate income taxes and interest paid on behalf of M & E for the years 1979, 1980, and 1981, plus statutory interest. (D.I. 5.)

The parties have filed cross-motions for summary judgment. (*See* D.I. 15; 19.) The parties do not dispute any material issues of fact and agree that the Court

needs only to resolve the legal issue of whether Section 6012 of the Internal Revenue Code ("the Code"), 26 U.S.C. § 6012 (1980), and the Regulations promulgated thereunder require Gunnip to file corporate income tax returns and pay Federal taxes on behalf of M & E for the years 1979 to 1983. For the reasons discussed below, the Court holds that the refunds were not issued erroneously and that Gunnip is entitled to refunds for 1979, 1980, and 1981. Therefore, the Court will grant Gunnip's motion for summary judgment and will deny the Government's motion for summary judgment.

## II. FACTS

### A. Background of McDonald & Eide, Inc.

McDonald & Eide, Inc., was incorporated under the laws of Delaware on October 16, 1953. (D.I. 16 [Affidavit of Frank A. Gunnip] at ¶ 1.) M & E engaged in the oil and gas exploration business in Montana from late 1953 until early 1955. (*Id.*) In 1954 M & E devoted nearly all its capital to a single well which proved to be dry in early 1955. Shortly thereafter, M & E ceased all operations. (*Id.*) On January 22, 1958, the Governor of Delaware repealed M & E's charter for failure to pay franchise taxes. (*Id.* at ¶ 2.) M & E shareholders were notified that the corporation had no assets and for all practical purposes was "defunct." (D.I. 14 [Resp. of Dft. Gunnip to Plfs. Req. for Admissions] at ¶ 7.)

When M & E's charter was revoked, its only assets were part-interest in various mineral rights and oil and gas leases. (D.I. 16 at ¶ 3.) From January 22, 1958 to June 1, 1961, title to all of M & E's assets was transferred to a group of six former M & E officers and the wife of one of these officers. (*Id.* at ¶ 4.) Several years later, a group of former shareholders investigated whether an action could be brought against certain former officers and directors of M

---

**1.** On April 7, 1987, this Court ordered the substitution of Frank A. Gunnip, Liquidating Trustee for the Benefit of the Share Equivalent Unit Holders of the Receivership Estate of McDonald & Eide, Inc., for Frank A. Gunnip, Receiver for McDonald & Eide, Inc. Because all of the acts in question occurred while Gunnip was the Receiver for M & E, this opinion will refer to him as such.

& E based on possible fraud, embezzlement, or use of former corporate assets for their own use and benefit. (D.I. 14 at ¶ 11.) In February 1965 these shareholders filed suit in the Delaware Court of Chancery. The suit sought the appointment of a receiver. (*Id.* at ¶ 12.) The request was granted in May 1965 and Frank A. Gunnip was appointed to be the receiver.[2] (*Id.* at 13.)

In 1967 Gunnip brought related actions in Montana and Minnesota against certain former M & E officers and shareholders and their transferees. The Minnesota suit sought to compel certain former shareholders to surrender to Gunnip stock for which valuable consideration was not paid. The Montana action was brought to recover mineral rights and lease interests that were allegedly misappropriated by the former officers. (D.I. 16 at ¶ 7.) Judgment was entered in favor of Gunnip in the Montana case in December 1970. (*Id.* at ¶ 8.) The Minnesota suit was settled in 1972 when the defendants agreed to reduce their holdings in M & E by approximately 100,000 shares. (*Id.* at ¶ 9.)

Until 1979 the lease interests and mineral rights recovered in the Montana suit appeared to be worthless. Then, in 1979, Gunnip was paid accumulated royalties pursuant to the terms of the leases. Since 1979 Gunnip has continued to collect lease royalty payments and has worked to identify all former M & E shareholders, so the royalty payments, leasehold interests, and mineral rights can be distributed. (*Id.* at ¶ 10.)

Besides pursuing the Montana and Minnesota suits and seeking to identify former M & E shareholders, Gunnip's activities have been minimal. In 1979 Gunnip instituted a suit to determine the amount he was entitled to receive pursuant to a lease. He filed a second suit in 1985 to quiet title to a leasehold interest. (*Id.* at 13.) These and Gunnip's other activities, such as executing division orders, obtaining appraisals, and preparing accountings and tax returns, have all been done under the

supervision of the Court of Chancery. (*Id.* at ¶¶ 13, 14.)

**B. Tax Dispute**

This case is a dispute over corporate income taxes paid by Gunnip on behalf of M & E. In January 1981 Gunnip requested a private letter ruling from the IRS on the question of whether Gunnip needed to file tax returns for the income from lease interests. The IRS ruled that Gunnip was required to file returns and pay corporate income taxes, because M & E was still considered to be in existence for Federal tax purposes and the lease payments were income. (*Id.* at Exhibit ["Ex."] G.) Subsequent to the Private Letter Ruling, Gunnip filed Form 1120 Corporation Income Tax Returns for the years 1979 through 1983 and paid the taxes due under protest. (*Id.* at Exs. I–L.) After the taxes were paid, Gunnip filed amended returns for the five years in question. The amended returns reported that tax was not due in any of the five years, because M & E did not exist for tax purposes during that time and therefore was not a taxable entity. (*Id.* at Exs. M–Q.) The claims for the 1979, 1980, and 1981 tax years were never acted on by the IRS, but for reasons not apparent to the Government, refund checks for the entire amount of taxes paid in 1982 and 1983 were generated and transmitted to Gunnip. The Government's claim seeks to recover the proceeds of these "erroneously" issued refund checks, whereas in the counterclaim, Gunnip seeks a refund of the taxes paid for 1979, 1980, and 1981.

**III. ANALYSIS**

If Gunnip is obligated to file returns and pay taxes on behalf of M & E, this obligation is imposed by Section 6012(b)(3) of the Code which states:

> In a case where a receiver, trustee in bankruptcy, or assignee, by order of a court of competent jurisdiction, by operation of law or otherwise, has possession of or holds title to all or substantially all the property or business of a corporation, whether or not such property or business

---

**2.** Whenever the Court refers to Gunnip, it is in his capacity as Receiver for M & E.

is being operated, such receiver, trustee, or assignee shall make the return of income for such corporation in the same manner and form as corporations are required to make such returns.

The Government contends this provision clearly requires that Gunnip file tax returns and pay the taxes due. Gunnip argues that the Government cannot require him to file returns and pay taxes, because Section 6012 only imposes such requirements on a receiver in situations where the corporation by itself would have to file returns and pay taxes. Gunnip asserts that this is not one of these situations, because M & E did not exist as a corporation during any of the years in question.

Two regulations promulgated under Section 6012 are relevant to this case. One is Treas.Reg. § 1.6012–3(b)(4) which is essentially a restatement of Section 6012.[3] The other is Treas.Reg. § 1.6012–2(a)(2) which states in part:

> A corporation *in existence* during any portion of a taxable year is required to make a return.... A corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs, such as for the purpose of suing and being sued. If the corporation has valuable claims for which it will bring suit during this period, it has retained assets and therefore continues in existence. A corporation does not go out of existence if it is turned over to receivers or trustees who continue to operate it.

(Emphasis added.) The Government posits that Section 6012 and Reg. § 1.6012–3(b)(4) clearly establish that Gunnip had to file returns and pay taxes for the years in question, regardless of the fact that Gunnip did not operate the business. (*See* D.I.

20 at 7–9.) Gunnip bases his argument and interpretation of Section 6012 on Reg. § 1.6012–2(a)(2). Gunnip contends this regulation clearly establishes that a corporation which no longer exists does not have to file returns or pay corporate income tax.

This Court's opinion is that the critical question which must be answered is whether M & E existed during the years in question. Reg. § 1.6012–2(a)(2) clearly makes existence a precondition to taxability. If M & E existed and the other conditions of Section 6012 are met, then Gunnip is not entitled to any refunds and the "erroneous" refunds must be turned over to the Government. As the discussion to follow will indicate, the Court must use what it will term the "Corporate Lifecycle Test" to determine whether M & E existed during the years in question.

▮▮ To determine whether M & E existed as a corporation during the years in question, the Court must look to Delaware law. *See Poro v. Commissioner,* 39 T.C. 641 (1963) (Status of the corporation determined according to the Stock Corporation Law of New York); *see also Messer v. Commissioner,* 52 T.C. 440 (1969), *aff'd,* 438 F.2d 774 (3d Cir.1971) (Whether corporation assigned notes and claims presents a question to be determined according to New Jersey law). Delaware law provides that if a corporation fails to pay franchise taxes assessed against it for one year, then "the charter of the corporation shall be void, and all powers conferred by law upon the corporation are declared inoperative...." 8 *Del. C.* § 510 (1983 Repl. Vol.). If the taxes remain unpaid, the Governor shall issue a proclamation repealing the corporation's charter. *Id.* at § 511. The Governor used this power to revoke M & E's charter in January 1958.

The legal existence of all Delaware corporations, "whether they expire by their own limitations *or are otherwise dis-*

---

**3.** The applicable portion of this Regulation states:

> A receiver, trustee in dissolution, trustee in bankruptcy, or assignee, who, by order of a court of competent jurisdiction, by operation of law or otherwise, has possession of or holds title to all or substantially all the property or business of a corporation, shall make the return of income for such corporation in the same manner and form as corporations are required to make such returns. Such return shall be filed whether or not the receiver, trustee, or assignee is operating the property or business of the corporation.

*solved,"* is continued for three years from such expiration or dissolution "or for such longer period as the Court of Chancery shall in its discretion direct...." *Id.* at § 278 (emphasis added). This three-year continuation period applied to M & E, because dissolution by Gubernatorial proclamation comes under the definition of "otherwise dissolved." *Harned v. Beacon Hill Real Estate Co.,* 9 Del.Ch. 232, 80 A. 805, 808 (1911), *aff'd,* 9 Del.Ch. 411, 84 A. 229 (Del.Supr.1912).

Although the parties never specifically discussed this point in their briefs, the Court of Chancery had to have used 8 *Del. C.* § 279,[4] instead of Section 278, as authority to appoint Gunnip as a receiver. The Court of Chancery's power under Section 278 to extend M & E's existence past the automatic three-year period terminated upon the expiration of the three-year period. *In re Citadel Industries, Inc.,* 423 A.2d 500, 502 (Del.Ch.1980). Section 279 was intended to apply in situations where the three-year period has already expired and has been used when a corporation was dissolved for failure to pay franchise taxes. *See Harned,* 80 A. at 807–08.

A minimal amount of Delaware case law exists interpreting the exact status of a corporation when Section 279 is utilized to appoint a receiver. Nevertheless, the Court of Chancery's *Citadel Industries* decision is particularly instructive.

*Citadel Industries* involved an application by General Electric Company ("G.E.") to extend the corporate existence of Citadel for the purpose of joining Citadel as a defendant to a lawsuit. Citadel's shareholders had adopted a plan of complete liquidation in 1973 and the liquidation was

completed by the end of November 1976. In December 1977 a grain elevator exploded in Texas killing twelve people and injuring many others. The accident spawned numerous lawsuits including one filed in September 1979 against G.E. This suit alleged that G.E. had manufactured certain locomotives used at the grain elevator and that these locomotives created sparks which ignited dust causing the explosion. G.E. quickly determined that the locomotives had been manufactured by a corporate predecessor of Citadel.

G.E.'s application to extend the corporate existence of Citadel was made pursuant to Section 278. The Court of Chancery held that it was "legally barred by the intent and purpose of § 278 from 'continuing' Citadel's corporate existence once the statutory three-year period had already expired...." 423 A.2d at 503. In his explanation of this holding, Vice Chancellor Brown stated:

> I am of the opinion that the emphasis is on "continuing" that which is already in existence *before the corporate entity, as a legal fiction, departs the legal realm and becomes only a recorded memory.* Even if "continued" at the discretion of the Court, *when the additional period expires, the dissolved corporation is no more.* Once the clock has ticked away its final hours, whether the duration is established by statute or by judicial discretion, it is 8 *Del.C.* § 279 that comes in to play.

423 A.2d at 504 (emphasis added). The Vice Chancellor went on to set forth the basic provisions of Section 279 then stated, "[Section 279] is necessary because once the three-year period under § 278 has ex-

---

**4.** Section 279 states:

When any corporation organized under this chapter shall be dissolved in any manner whatever, the Court of Chancery, on application of any creditor or stockholder of the corporation, or on application of any one, who, in the Court's discretion, shows good cause therefor, at any time, may either appoint 1 or more of the directors of the corporation to be trustees, or appoint 1 or more persons to be receivers, of and for the corporation, to take charge of the corporation's property, and to collect the debts and proper-

ty due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation, or otherwise, all such suits as may be necessary or proper for the purposes aforesaid, and to appoint an agent or agents under them, and to do all other acts which might be done by the corporation, if in being, that may be necessary for the final settlement of the unfinished business of the corporation. The powers of the trustees or receivers may be continued as long as the Court of Chancery shall think necessary for the purposes aforesaid.

pired ... the corporate officers have no power to continue their winding up duties. *They have no power to act because the corporation no longer has legal existence." Id.* (cite omitted) (emphasis added).

This Court concludes that *Citadel Industries* is controlling precedence on the issue of M & E's status during the years in question. Threfore, the Court holds that as a matter of Delaware law M & E did not legally exist as a corporation in 1979 or any year thereafter. M & E was dissolved in 1958 by Gubernatorial proclamation. Section 278 extended M & E's corporate existence for three years. Once those three years passed without an extension from the Court of Chancery, M & E reached the end of its "corporate lifecycle" and ceased to exist as a corporation.

Section 6012 of the Code requires a Receiver to "make the return of income for such corporation in the same manner and form as corporations are required to make such returns." In this case, the corporation did not exist during the years taxes were paid. Reg. § 1.6012–2(a)(2) adds support to the conclusion that only corporations in existence are required to file taxes.[5] The regulation does state that "[a] corporation does not go out of existence if it is turned over to receivers or trustees who continue to operate it," but the Court is unconvinced that this sentence means that Gunnip was required to file returns and pay taxes in the years in question. In the sentence before, the Regulation states that "[a] corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs...." Here the federal definition of existence can be more restrictive than a potential state law definition of existence. M & E meets this federal definition. By 1979 M & E had long ago ceased business, dissolved, and distributed its assets. The Court's opinion that the logical conclusion from reading the regulation as a whole is

that if an *existing* corporation is turned over to receivers or trustees, then the corporation continues to exist for Federal tax purposes. The Court cannot accept the argument that this sentence about receivers and trustees was meant to apply in situations such as this case.

Reg. § 1.6012–2(a)(2) furthers the goal of equitably imposing tax burdens on persons or corporations similarly situated. The regulation requires a winding-up corporation to pay taxes regardless of whether this phase of the corporate lifecycle is guided by officers and directors or trustees and receivers. This goal would not be furthered by interpreting this regulation to mean that the appointment of a receiver to act on behalf of former shareholders of a nonexistent, dissolved corporation serves to resurrect the corporation for Federal tax purposes. Such an interpretation would result in former shareholders of a corporation dissolved without problems being responsible only for the individual tax liability relating to distributed assets of the corporation, whereas the former shareholders of a corporation such as M & E which had an inequitable distribution of assets would receive the assets after a tax has been imposed at the corporate level and would still have to pay any individual tax liability relating to the assets.

The Court's conclusion that M & E did not exist during the years in question and therefore did not have to pay Federal tax is supported by several previous decisions. *Commissioner v. Henry Hess Co.*, 210 F.2d 553 (9th Cir.1954), is similar to the present case in many respects. Henry Hess Co. ("Hess") had a ship requisitioned by the Government during World War II. A dispute existed over the value of the ship when it was requisitioned. Hess dissolved in 1942 and assigned its claim for the value of the ship to another company which also dissolved and assigned the claim to its shareholders. When the dispute over the value of the ship was finally resolved, the War Shipping Administration insisted on paying the company instead of the share-

---

**5.** As noted above, the first line of the regulation states that "[a] corporation *in existence* during any portion of a taxable year is required to make a return." (Emphasis added.)

holders. The Ninth Circuit held that the proceeds were not taxable to the corporation. The Court explained that "[o]nce a corporation has dissolved, its position is in many ways analogous to that of a dead person." *Id.* at 557 (citing *Defense Supplies Corp. v. Lawrence Warehouse Co.*, 336 U.S. 631, 634, 69 S.Ct. 762, 763, 93 L.Ed. 931 (1949).

M & E is in the same situation as Hess, because both received payments after they had been dissolved. The only difference in this case is that a receiver was appointed to protect the rights of certain former shareholders. In *Hess* the Ninth Circuit held the money was taxable just to the shareholders. This Court does not believe a contrary conclusion is justified when a receiver is appointed to ensure that payments generated by former corporate assets are received and to assist the Court of Chancery in determining which former shareholders are entitled to payment. As discussed above, to hold otherwise would be tantamount to imposing a penalty on former corporate shareholders who attempt to rectify an inequitable distribution of assets during dissolution. These shareholders will receive what is left after the Government collects a tax at the corporate level and will still have to pay any individual income tax liability generated by the money received. Therefore, these shareholders would be worse off than shareholders who had the good fortune of holding stock in a corporation which did not have any problems with the distribution of assets upon dissolution, because these shareholders would receive payments which were not taxed at the corporate level.

The Sixth Circuit has had to decide whether income received in 1949 by a Trustee who had become the sole shareholder of a corporation dissolved in 1945 was taxable at the corporate level. *Cold Metal Process Co. v. Commissioner*, 247 F.2d 864 (6th Cir.1957). Cold Metal's principal assets consisted of two patents. The United States instituted a suit against Cold Metal in 1943 seeking cancellation of the patents. The Government and Cold Metal were still embroiled in litigation when Cold Metal dissolved in 1945. In 1949 the case was finally terminated in favor of Cold Metal. Funds which had been impounded during the litigation were released to the Trustee which had acquired all of Cold Metal's assets and liabilities upon its dissolution.

The Sixth Circuit rejected the Commissioner's argument that the impounded funds were ordinary corporate income of Cold Metal. The Sixth Circuit first concluded that Cold Metal had not anticipatorily assigned income and then went on to state:

> If we are wrong in this conclusion, the assessment against Cold Metal can nevertheless not stand because Cold Metal, as a corporation, had been dissolved in 1945 and was not in legal existence in 1949. We are not in agreement with the Commissioner's contention and the Tax Court's conclusion that even if it had dissolved in 1945 under the state law, it was still in existence in 1949 for Federal income tax purposes.

*Id.* at 873. The Court went on to explain its position as follows:

> [W]e have difficulty in reconciling our fundamental concept of Federal income taxation with the proposition that an income tax can be assessed against a non-existing corporation. The making of an assessment would seem to require the existence in the taxable year of the taxpayer against whom the assessment is to run. Income tax liability is statutory. We find no Federal statute which requires a non-existing taxpayer to file an income tax return or which imposes an income tax liability for a certain year upon a so-called taxpayer who was not in existence during that taxable year.

*Id.* at 874.

One additional case with facts similar to this case lends support to the conclusion that M & E did not have to pay corporate income taxes in the disputed years. *Poro v. Commissioner*, 39 T.C. 641 (1963). *Poro* involved a husband and wife who owned all the stock of East Islip Theatre, Inc. ("East Islip"). East Islip was dissolved in 1949 and all its assets were distributed to the

shareholders that year. In June 1953 an antitrust suit was brought against Loew's, Inc., and other film distributors in the name of East Islip and James Poro, Katherine Poro, and Gloria Poro Hellig, as trustees in dissolution. The suit sought recovery for loss of profits and other damages caused by alleged violations of the antitrust laws from 1932 to 1948. The suit was settled in 1956.

The Commissioner took the position that despite the dissolution of East Islip in 1949 and the distribution of all its assets, East Islip remained in existence through the time the suit was settled for the purpose of winding up its affairs. The Tax Court disagreed. The court did not consider it significant that the claim against Loew's was not specifically mentioned when East Islip was dissolved in 1949, because the claim apparently was considered valueless in 1949. *Id.* at 644. Additionally, the court stated that filing the suit nominally in the name of the corporation, as well as using the names of the trustees in dissolution, did not make the recovery income to the corporation. The Tax Court concluded that at the time of recovery the completely liquidated East Islip "was dead." *Id.*

The *Poro* Court noted that the Commissioner's brief cited Reg. § 1.6012–2(a)(2) as authority for his position. The Commissioner emphasized the last sentence of the Regulation which states, "A corporation does not go out of existence if it is turned over to a receiver or trustee who continues to operate it." The *Poro* court did not believe this sentence of the Regulation was in harmony with the facts of that case. 39 T.C. at 644–45. Instead, the court stated that the sentence which provides that "[a] corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs, such as for the purpose of suing and being

sued" more nearly fit the facts of the case. *Id.* at 645. The *Poro* court's conclusion about which part of Reg. 1.6012–2(a)(2) fits the facts of that case comports with this Court's earlier discussion of the relation of this Regulation to this case.

*Poro, Cold Metal,* and *Hess* all illustrate the importance of applying the Corporate Lifecycle Test. As was stated above, when the Test is applied to this case the Court cannot help but conclude that M & E was a dissolved, nonexistent corporation in 1979 and the years thereafter. The Court does not believe that 8 *Del.C.* § 279, which provided the mechanism to appoint Gunnip as the receiver of M & E, revives the legal existence of a corporation. Even if this conclusion is incorrect, the Court concludes that M & E was revived only for the limited purposes described in Reg. § 1.6012–2(a)(2) and therefore did not exist for Federal tax purposes during the years in question.

■ The Government strongly argues in its briefs that Gunnip's reliance on *Poro, Cold Metal,* and *Hess* is misplaced because these cases were decided under Section 52(a) of the 1939 Code, instead of Section 6012 of the 1954 Code.[6] Section 52(a) imposed the obligation to file returns and pay taxes on receivers who were "operating the property or business of the corporation." Section 6012 which was the successor to Section 52(a) changed the language of Section 52(a) so that the obligation to file returns and pay taxes is imposed on receivers "whether or not [the corporation's] property or business is being operated." The Government contends this change means that Gunnip must file returns and pay taxes even though he is not operating M & E's business.

The Court rejects the Government's argument that the cases relied upon by Gunnip are inapposite on two grounds. First, the legislative history of Section 6012 supports the conclusion that the change from Section 52(a) was simply meant to clarify

6. The Government also contends that *Poro* does not apply because the petitioners were "Trustees in Dissolution" which were not covered by Section 6012(b)(3), as then in effect. The Court flatly rejects this argument. Reg. § 1.6012–

3(b)(4) and its predecessor under the 1939 Code, Reg. § 39.52–2, make it perfectly clear that a "trustee in dissolution" has the same obligation as a receiver to file returns and pay taxes.

existing law. H.R.Rep. No. 1337, 83d Cong., 2d Sess. A. 396 (1954); S.Rep. No. 1622, 83d Cong., 2d Sess. 663 (1954). Second, several Courts have failed to recognize the change between sections 52(a) and 6012 as a substantive modification. Although *Cold Metal, Poro,* and *Hess* all dealt with years governed by the 1939 Code, each was decided after 1954. If the change had been viewed as having an impact on when receivers have to file returns and pay taxes, the Court believes that at least one of these courts would have noted that its decision might have been different if the case was decided under section 6012 instead of section 52(a).

At least one court considered the significance of the change between the 1939 and 1954 Codes. *Hersloff v. United States,* 159 Ct.Cl. 366, 310 F.2d 947 (1962), *cert. denied sub nom. Hersloff & Stern v. United States,* 373 U.S. 923, 83 S.Ct. 1524, 10 L.Ed.2d 422 (1963). In *Hersloff* the Court of Claims had to determine whether a corporation was subject to corporate income tax in 1949, 1953, and 1954. The court noted that the first two years are governed by the 1939 Code and the third by the 1954 Code. The court then discussed the cases decided under the 1939 Code and the test established by those cases. *Id.* 310 F.2d at 950. After this discussion the court reached the following conclusion: "In view of the similarity of the statutory provisions and regulations, the test under the 1954 Code must be the same. The necessary corollary under both Codes is that income received by the trustees *during such a period of continued existence* must be reported as the corporation's income." *Id.* 310 F.2d at 951 (emphasis added). The *Hersloff* court clearly stated that the change between the wording of section 52(a) and section 6012 did not lessen the importance of the Corporate Lifecycle Test.

The importance of the Corporate Lifecycle Test is further affirmed by contrasting *Hersloff* with a second decision involving the same parties. *See Hersloff v. Commissioner,* 46 T.C. 545 (1966) (*"Hersloff II"*). In *Hersloff II* the court held that corporate income tax did not have to be paid for the years 1960 to 1963. *Id.* at 550. The court

reached this decision because between 1954, which was the last tax year dealt with in *Hersloff,* and 1960 the corporation had completely terminated its existence for tax purposes. *Id.* at 552–53. Again, the critical consideration was whether the corporation existed during a particular year.

This Court's conclusion that M & E was not in existence during the disputed period and therefore not obligated to pay corporate taxes is supported not only by the cases already discussed, but also by contrasting this case with others in which the corporation was deemed to be liable for Federal taxes. One of these cases involved a corporation which dissolved in 1932, but had to renegotiate the terms of the sale of certain assets in 1935. *O'Sullivan Rubber Co. v. Commissioner,* 120 F.2d 845 (2d Cir.1941). The court held that the corporation was liable for taxes in 1935. The court explained that taxes were due because although the corporation had dissolved, it was still in the process of liquidating and that this liquidation period was a natural part of the corporation's lifecycle. *Id.* at 847. In another case, a dissolving corporation retained some notes receivable in order to satisfy an obligation of the corporation. *Messer v. Commissioner,* 52 T.C. 440 (1969). The court held that the corporation had to pay taxes on the interest income received by holding the notes. *Id.* at 448. The court noted that Reg. § 1.6012–2(a)(2) explicitly continues the existence of corporations which have retained assets upon dissolution.

The *O'Sullivan* and *Messer* holdings are consistent with this Court's holding. Both are examples of the application of the Corporate Lifecycle Test. The difference between this Court's holding and the *O'Sullivan* holding is that in this case M & E had reached the end of its lifecycle and legally ceased to exist, whereas the corporation in *O'Sullivan* had not yet reached the end of its existence. *See Poro,* 39 T.C. at 644 ("O'Sullivan Rubber Co. was not dead but moribund. East Islip Theatre, Inc. [or M & E], was dead."). Similarly, the *Messer* corporation had not reached the end of its lifecycle, due to the retention of assets

necessary to satisfy an outstanding obligation. This is in contrast to M & E which distributed all its assets upon dissolution.

■ As discussed above, Reg. § 1.6012–2(a)(2) provides that a corporation does not exist "after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs...." The regulation goes on to state that "[i]f the corporation has valuable claims for which it will bring suit during this period, it has retained assets and therefore continues in existence." The Court highlights this portion of the regulation, because Gunnip has brought several suits during his tenure as Receiver. In the Court's opinion, none of these suits qualifies as a retained asset of M & E.

The suits brought by Gunnip are not retained assets for either of two reasons. First, they are not "valuable claims" for which suit was brought during the three-year liquidation period established by 8 *Del.C.* § 278. These suits were brought a number of years after M & E had been dissolved. This is the same situation as in *Poro* where the court held that the claim against Loew's was not a retained asset because no one knew the claim had value at the time the corporation was dissolved and suit was not brought until three and a half years after all of East Islip's assets had been distributed. 39 T.C. at 645. Second, except for the suit to quiet title, the suits brought by Gunnip have not been for the purpose of recovering property or assets to which M & E would have been entitled if it had continued to exist. Both the Montana and Minnesota suits were brought on behalf of the shareholders who had successfully petitioned for the appointment of a Receiver. These suits were for the purpose of establishing the relative rights of all former M & E shareholders, instead of for the purpose of expanding the pool of corporate assets available for distribution to shareholders. The Court is unconvinced that these equitable actions constitute valuable claims of the corporation for purposes of the regulation or section 6012.

The Government has strenuously contended that *In re I.J. Knight Realty Corp.*, 501 F.2d 62 (3d Cir.1974), is applicable to this case and that this Court is bound to follow it. (*See* D.I. 23 at 4, 5.) The Court rejects the Government's argument, because *I.J. Knight* is distinguishable from the case before the Court.

The issue in *I.J. Knight* was whether "a 'nonoperating' trustee of a bankrupt corporation [is] liable for the payment of federal taxes on income generated during the liquidation and distribution of the bankrupt estate?" 501 F.2d at 62. Knight, the bankrupt, owned as its principal asset a building and its sole business was leasing space in the building and providing maintenance services to tenants. Knight filed a petition for an arrangement under Chapter XI of the Bankruptcy Act in November 1962. A receiver was appointed and authorized to operate Knight's business. The building was destroyed by fire in January 1963. Therefore, the receiver no longer had a business to operate.

Knight was declared a bankrupt in May 1963 and a trustee was appointed. At that time Knight's assets consisted of claims against various insurance companies, the land on which the building had stood, and a minimal amount of cash. Over the next several years the trustee was involved in resolving Knight's claims against the insurers, satisfying Knight's obligations, and investing any excess funds. In 1967 the trustee filed federal tax returns for fiscal years 1963 through 1966. The trustee filed returns for fiscal years 1967 through 1970 in due course. None of these returns showed any tax due.

The trustee's returns were audited in 1971 and various adjustments were made to the trustee's computations. These changes resulted in deficiencies. Therefore, the Commissioner filed a proof of claim in the bankruptcy proceeding asserting that the trustee was liable for the payment of $366,736.05 in taxes, interest, and penalties. The income in question was derived by the trustee from a capital gain on the condemnation sale of the land to the

City of Philadelphia, and from interest on the insurance proceeds.

The trustee contended he was not obligated by Section 6012 to pay the taxes. The Third Circuit disagreed and stated, "we think that a fair reading of the pertinent sections of the Internal Revenue Code renders the non-operating trustee of a bankrupt corporation liable for the payment of taxes on the bankrupt's income, provided the trustee has possession of, or title to, substantially all the bankrupt's property." 501 F.2d at 66.

The Government attempts to analogize between Knight and M & E by stating that both corporations were not being operated by the trustee or receiver, had property consisting mainly of choses in action, and derived income solely from passive sources. From this the Government concludes that Knight "was merely being liquidated, in much the same manner that [M & E] was being liquidated...." (D.I. 23 at 4.) The Court disagrees with the Government's conclusion, because the facts of this case are considerably different than those in *I.J. Knight. I.J. Knight* involved a corporation which was moving through the liquidation phase of its corporate lifecycle. A receiver, then a trustee, was appointed at the beginning of Knight's move into bankruptcy and liquidation. This is very different from Gunnip who was appointed several years after M & E had dissolved, had ceased to exist under Delaware law, and had distributed all its assets. If Gunnip had been appointed by the Court of Chancery when M & E's charter was repealed by the Governor or during the three-year extension period established by 8 *Del.C.* § 278, then the Government's attempt to draw a parallel between this case and *I.J. Knight* might have some foundation.

Besides having different facts, this case and *I.J. Knight* involved very different legal arguments. In *I.J. Knight* the trustee made two arguments to support his contention that section 6012 did not apply to him.

The first argument was that the obligation to pay (to file a "return of tax") established by section 6151 of the Code does not automatically apply to all those required by section 6012 to file a "return of income." The second argument seized on several words in section 960 of the Judicial Code, 28 U.S.C. § 960 (1968), as the basis to conclude that section 6012 only applies to trustees "conducting" business.[7] Neither of these arguments was made by Gunnip. Instead, Gunnip argued that the conditions necessary to apply section 6012 are not present because M & E does not legally exist as a corporation. This is completely different from *I.J. Knight* where the trustee conceded he satisfied the provisions necessary for section 6012 to apply. 501 F.2d at 66. Therefore, the Third Circuit did not have to consider the issue of corporate existence which stands at the center of this case.

## IV. CONCLUSION

An application of the Corporate Lifecycle Test to this case clearly indicates that M & E did not exist as a Delaware corporation in the years 1979 through 1983. Therefore, Gunnip was not required to file returns or pay taxes in those years. Gunnip's motion for summary judgment will be granted, because he is entitled to a refund of taxes and interest paid, plus statutory interest, for the years 1979, 1980, and 1981. The Government's motion for summary judgment will be denied, because Gunnip was entitled to the refunds for 1982 and 1983 which the Government contends were "erroneously" issued.

A final judgment will be entered in conformity with this opinion.

---

**7.** Section 960 of the Judicial Code states, "Any officers and agents conducting any business under authority of a United States Court shall be subject to all federal, state and local taxes applicable to such business to the same extent as if it were conducted by an individual or corporation."